UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
------------------------------------- X
                                      :
DOMINICK VOLINO, ET AL.,              :
                         Plaintiffs,  :
                                      :           21 Civ. 6243 (LGS)
-against-                             :
                                      :
PROGRESSIVE CASUALTY INSURANCE        :
COMPANY, ET AL.,                      :
                         Defendants.  :
                                      :
------------------------------------- X
                                      :
MICHAEL VERARDO, ET AL.,              :
                         Plaintiffs,  :
                                      :           22 Civ. 1714 (LGS)
-against-                             :
                                      :
PROGRESSIVE CASUALTY INSURANCE        :
COMPANY, ET AL.,                      :
                         Defendants.  X
```

**CONSOLIDATED AMENDED CLASS ACTION COMPLAINT**

John Plotts, Kevin Lukasik, Lorenzo Costa, Zachary Goodier, James England, Michael Verardo, and Lori Lippa (collectively, "Plaintiffs") bring this class action on behalf of themselves and all others similarly situated, by and through undersigned counsel, and for their Consolidated Amended Complaint against Progressive Casualty Insurance Company ("Progressive Casualty"); Progressive Advanced Insurance Company ("Progressive Advanced"); Progressive Specialty Insurance Company ("Progressive Specialty"); and Progressive Max Insurance Company ("Progressive Max) (collectively "Defendants" or "Progressive") state and allege as follows:

**INTRODUCTION**

1.      This is a class action on behalf of Plaintiffs and all other similarly situated claimants in New York who received a payment for the loss of a totaled vehicle from Defendants, where

1

Defendants used valuation reports prepared by Mitchell International, Inc. ("Mitchell") to determine the actual cash value of the loss vehicles. By using these valuation reports, Defendants systemically thumb the scale when calculating the actual cash value of claimants' loss vehicles by applying so-called "Projected Sold Adjustments" ("PSA") that are: (a) deceptive and unexplained; (b) contrary to appraisal standards and methodologies; (c) not based in fact, as they are contrary to the used-car industry's market pricing and inventory management practices; (d) not applied by the major competitor of Defendants' vendor Mitchell; (e) not applied by Defendants and Mitchell to insureds in other states like California and Washington; (f) calculated using a statistically invalid methodology; and (g) in breach of Progressive's form insurance policy and violative of 11 NYCCR § 216.0 *et seq.* ("Regulation 64").

2.     When valuing total-loss claims for vehicles, it is improper for an automobile insurance company, such as Progressive, to undervalue and underpay claims by manipulating the data used to determine the actual cash value of insureds' and claimants' totaled vehicles. Specifically, under their insurance policy terms and applicable New York law, Defendants have a duty to pay, and represent that they will pay, the actual cash value of a loss vehicle when adjusting total-loss claims.

3.     Notwithstanding these obligations and representations, Defendants systemically pay less than actual cash value by using a valuation process that employs improper, unreasonable, and statistically invalid adjustments for the sole purpose of reducing the value of comparable vehicles specified in the valuation reports, which in turn reduces the valuation of the total-loss vehicles and the claim payment to the insured or claimant.

4.     Specifically, Defendants, through Mitchell, systemically apply the so-called "Projected Sold Adjustment" that results in a significant downward adjustment to the base values

of the comparable vehicles used to calculate the actual cash value of Plaintiffs' and Class members' total-loss vehicles. This reduction is contrary to appraisal standards and methodologies and is not based in fact, as it is contrary to the used car industry's market pricing and inventory management practices. The adjustment is applied to each of the comparable vehicles on top of adjustments for differences such as mileage, options, and equipment. The only purported explanation for the downward adjustment appears on the last page of the valuation reports and is a general, nondescript statement claiming that the reduction is to "reflect consumer purchasing behavior (negotiating a different price than the listed price)." Exhibit 1 at p. 8.

5.  ███████████████████████████████████████

███████████████████████████████████████████████

█████████████████████  Worse than this complete lack of curiosity is that Defendants thumb

the scale by ████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

█████████████████████████

████ Nevertheless, Progressive applies a PSA of ████████ to the advertised (or listed) price of comparable vehicles when calculating the actual cash value of total-loss vehicles.

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████ To arrive at the PSA amount, however, Progressive, through third-party vendors and as set forth above,

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████

7.      As explained herein, the used auto market is such that, given the ubiquity of Internet advertising and shopping and developments in sophisticated pricing software, car dealerships simply do not negotiate off of Internet advertised prices. Any difference between a list and sales price does not reflect a negotiation of the vehicle's *cash* value, but rather that a dealer shifted its profits to other components of the transaction: for example, profits made through financing or trade-in or ancillary products described above, or that the dealer applied a generally unavailable discount to the cash value of the vehicle (such as employee discount, loyalty discount, military discount, or friends/family discount). ████████████████████████████

███████████████████████████████████████████████

8.      To arrive at its conclusion that consumers negotiate down the advertised price by ██████████████ Progressive, through its vendors, ████████████████████████

████████████████████████████████ all for the purpose of applying a capricious, meretricious, and unjustified PSA so as to artificially deflate the value of total-loss vehicles.

9.     Beyond being fundamentally false, and resulting merely from ████████ and arbitrary, unjustifiable assumptions, the manner in which the Projected Sold Adjustment is calculated violates certain specific requirements set forth in Regulation 64. Pursuant to Regulation 64, the State of New York imposes minimum standards for the prompt, fair, and equitable settlement of total-loss property claims that are incorporated by law into Defendants' insurance contracts with their insureds and also apply to Defendants' adjustment of third-party claims. Among other requirements, Regulation 64 requires that insurance companies who, like Defendants, use computerized databases to value total-loss claims must (1) utilize a methodology that produces "statistically valid" fair market values for a substantially similar vehicle in the "local market area," (2) base their analysis only on data within the "local market area," statutorily defined as a 100-mile radius, limited to within the United States, of the principal garagement of the vehicle, and (3) base their valuation on data from vehicles sold within 90 days prior to the loss in the local market area. 11 NYCCR § 216.7(a)(10) & (c)(1)(iii). By calculating and applying the Projected Sold Adjustment, Defendants ████████████████████████████████████████ and use an invalid, arbitrary, and erroneous methodology that significantly underpaid the total-loss claims of Plaintiffs and the members of the proposed Classes.

10.     This pattern and practice of undervaluing total-loss vehicles when paying claims through the systemic use of these invalid and deceptive adjustments, which benefits the insurer at the expense of the insured, violates Defendants' form insurance policies, Regulation 64 governing the adjustment of total loss claims, and the New York General Business Law § 349 ("GBL").

## JURISDICTION AND VENUE

11.     Minimal diversity exists under the Class Action Fairness Act ("CAFA"), 28 U.S.C. §§ 1332(d), 1441(a)-(b), and 1453. Plaintiffs and the proposed class members are citizens of the State of New York. Defendants were all incorporated in Delaware and have their corporate headquarters in Mayfield Village, Ohio, and, at all relevant times, were engaged in the business of marketing and selling insurance policies and adjusting insurance claims in the State of New York.

12.     There are more than ███████ putative class members, and the aggregate compensatory damages (in the amount of the Projected Sold Adjustments that were deceptively deducted), claimed by Plaintiffs and the Classes ███████████.

13.     Venue is proper in this District under 28 U.S.C. § 1391, as a substantial portion of the conduct giving rise to Plaintiffs' claims occurred in this District, and Defendants transact business in this District.

## PARTIES

14.     Plaintiff John Plotts resides in Wayne County, New York. At all relevant times, Plaintiff Plotts was contracted with Progressive for automobile insurance. On or about September 22, 2020, Plaintiff Plotts was in a car wreck and Defendants deemed his vehicle to be a total loss.

15.     Plaintiff Kevin Lukasik resides in Saratoga County, New York. At all relevant times, Plaintiff Lukasik was contracted with Progressive for automobile insurance. On or about February 27, 2019, Plaintiff Lukasik was in a car wreck and Defendants deemed his vehicle to be a total loss.

16.      Plaintiff Lorenzo Costa resides in Suffolk County, New York. At all relevant times, Plaintiff Costa was contracted with Progressive for automobile insurance. On or about May 28, 2020, Plaintiff Costa was in a car wreck and Defendants deemed his vehicle to be a total loss.

17.     Plaintiff Zachary Goodier resides in Niagara County, New York. At all relevant times, Plaintiff Goodier was contracted with Progressive for automobile insurance. On or about June 18, 2018, and again on February 8, 2019, Plaintiff Goodier was in a car wreck and Defendants deemed his vehicles to be total losses.

18.     Plaintiff James England resides in Fulton County, New York. On or about June 20, 2020, Plaintiff England was in a car wreck with a Progressive insured, and Defendants deemed his vehicle to be a total loss.

19.     Plaintiff Michael Verardo resides in Dutchess County, New York. At all relevant times, Plaintiff Verardo was contracted with Progressive for automobile insurance. On or about April 28, 2017, Plaintiff Verardo was in a car wreck and Defendants deemed his vehicle to be a total loss.

20.     Plaintiff Lori Lippa resides in Monroe County, New York. At all relevant times, Plaintiff Lippa was contracted with Progressive for automobile insurance. On or about November 4, 2020, Plaintiff Lippa was in a car wreck and Defendants deemed her vehicle to be a total loss.

21.     Defendant Progressive Casualty has its corporate headquarters located at 6300 Wilson Mills Rd, W33, Mayfield Village, OH 44143. According to the Progressive website[1], Progressive Casualty, in coordination with other affiliated entities within the Progressive Group, conducts business in New York and throughout the country under the brand Progressive, or the Progressive Group of Insurance Companies, underwriting auto insurance to over 20 million drivers countrywide. The 2019 Annual Report for Progressive Corporation reported $37.6 billion in net premiums written by Progressive Corporation and its subsidiaries. Exhibit 9 at p. 2. In the state of New York, Progressive Casualty underwrites auto insurance in coordination with other

---

[1] https://www.progressive.com/auto/.

Progressive Group entities, all of which are registered with the New York Department of Financial Services under the same Group Number (155), Group Name ("Progressive Group"), with the same website (https://www.progressive.com), and the same address (6300 Wilson Mills Rd, W33, Mayfield Village, OH 44143). The Progressive Group entities issuing auto insurance policies in the State of New York include: Progressive Casualty Insurance Company, Progressive Advanced Insurance Company, Progressive Specialty Insurance Company, Progressive Max Insurance Company, Progressive Northwestern Insurance Company, Progressive Direct Insurance Company, and Progressive Northern Insurance Company.

22.     Progressive Casualty performs all material insurance operations related to auto insurance policies underwritten by Progressive Group entities in the State of New York. Most relevant to this action, Progressive Casualty manages and implements the adjustment of total-loss automobile claims made on policies of insurance issued by it and other Progressive Group entities in New York, pursuant to the same policies and practices, by the same adjustor employees working in the same claims centers, utilizing a single website (www.progressive.com), and using the same address, telephone number, trademarks and letterhead on correspondence. Consistent with these common adjustment policies, practices, and employees, job postings at the Progressive website refer throughout to "Progressive" as the entity advertising for employment. Exhibit 10.

23.     Progressive Casualty owns the website www.progressive.com.

24.     Progressive Casualty provides marketing services for each Progressive Group entity.

25.     Customers in New York can purchase from Progressive Casualty's website a policy from any of the Progressive Group entities.

26.     Progressive Casualty employs the adjusters who adjust auto insurance claims covered by a policy underwritten by each Progressive Group entity in the state of New York.

27.     Through these adjustors, as detailed at the Progressive website, Progressive Casualty investigates, handles, and adjusts all insurance claims using the same policies and procedures, regardless which Progressive Group entities were identified or disclosed in the relevant policy. *See* Exhibit 11. These common policies and procedures, implemented by the same adjustor employees, apply specifically to the adjustment of claims for actual cash value when a total loss is covered by the policy. *Id.*

28.     Progressive Casualty maintains the databases of claim information for all auto claims, regardless of which Progressive Group entity underwrote the insurance or issued the policy covering the claim. Progressive Casualty employed and paid the adjusters who adjusted Plaintiffs' and the putative Classes' total-loss claims.

30.     Consistent with marketing, selling, and adjusting insurance under the same Progressive Casualty–owned brands and trademarks, out of the same corporate headquarters and regional offices, and via the same website (www.progressive.com), Progressive Casualty participate in drafting the other Defendants' policies and underwriting insurance policies with no material differences relevant to the claims in this action, regardless which Progressive Group entity may be identified on the insurance policy.

31.     Consistent with these claims practices, each of the Plaintiffs' valuation reports refer only to the Progressive Group of Insurance Companies, without reference to any individual

Progressive Group entity. Exhibits 1-8. Similarly, each Plaintiff's Settlement Summary references only the Progressive Group of Insurance Companies. Exhibits 12-19.

32.     Consistent with all the above, the terms of service for the Progressive website defines "Progressive" as Progressive Casualty Insurance Company and its affiliated companies;[2] Progressive Casualty is the owner of at least 207 trademarks utilized commonly by the Progressive Group entities, (Exhibit 20); and Progressive Casualty is the owner of at least 19 patents related to how it processes insurance claims and performs other insurance marketing and management functions on behalf of the Progressive Group entities, (Exhibit 21). Other Progressive Group entities utilize Progressive Casualty's brands and trademarks.

33.     Defendant Progressive Advanced has its corporate headquarters located at 6300 Wilson Mills Rd, W33, Mayfield Village, OH 44143. Progressive Advanced issues insurance policies in New York and is registered with the New York Department of Financial Services under the same Group Number (155), Group Name ("Progressive Group"), with the same website (https://www.progressive.com), and the same address (6300 Wilson Mills Rd, W33, Mayfield Village, OH 44143) as Progressive Casualty, Progressive Max, and Progressive Specialty.

34.     Defendant Progressive Max has its corporate headquarters located at 6300 Wilson Mills Rd, W33, Mayfield Village, OH 44143. Progressive Max issues insurance policies in New York and is registered with the New York Department of Financial Services under the same Group Number (155), Group Name ("Progressive Group"), with the same website (https://www.progressive.com), and the same address (6300 Wilson Mills Rd, W33, Mayfield Village, OH 44143) as Progressive Casualty, Progressive Advanced, and Progressive Specialty.

---

[2] https://www.progressive.com/copyright/

35.     Defendant Progressive Specialty has its corporate headquarters located at 6300 Wilson Mills Rd, W33, Mayfield Village, OH 44143. Progressive Specialty issues insurance policies in New York and is registered with the New York Department of Financial Services under the same Group Number (155), Group Name ("Progressive Group"), with the same website (https://www.progressive.com), and the same address (6300 Wilson Mills Rd, W33, Mayfield Village, OH 44143) as Progressive Casualty, Progressive Advanced, and Progressive Max.

## FACTUAL ALLEGATIONS

### Defendants' Systemic Application of Projected Sold Adjustments.

36.     On September 22, 2020, Plaintiff Plotts was involved in a car wreck and sustained physical damage to his vehicle. At the time of the car wreck, Plaintiff Plotts was contracted with Progressive for automobile insurance through a policy underwritten by Progressive Advanced in coordination with Progressive Casualty.

37.     On February 27, 2019, Plaintiff Lukasik was involved in a car wreck and sustained physical damage to his vehicle. At the time of the car wreck, Plaintiff Lukasik was contracted with Progressive Casualty for automobile insurance.

38.     On May 28, 2020, Plaintiff Costa was involved in a car wreck and sustained physical damage to his vehicle. At the time of the car wreck, Plaintiff Costa was contracted with Progressive for automobile insurance through a policy underwritten by Progressive Specialty in coordination with Progressive Casualty.

39.     On June 18, 2018, and again on February 8, 2019, Plaintiff Goodier was involved in a car wreck and sustained physical damage to his vehicles. At the time of each car wreck, Plaintiff Goodier was contracted with Progressive for automobile insurance through a policy underwritten by Progressive Advanced in coordination with Progressive Casualty.

40.     On June 20, 2020, Plaintiff England was involved in a car wreck and sustained physical damage to his vehicle. The driver of the other vehicle had a policy of insurance issued by Progressive Specialty in coordination with Progressive Casualty.

41.     On April 28, 2017, Plaintiff Verardo was involved in a car wreck and sustained physical damage to his vehicle. At the time of the car wreck, Plaintiff Verardo was contracted with Progressive for automobile insurance through a policy of insurance underwritten by Progressive Max in coordination with Progressive Casualty.

42.     On November 4, 2020, Plaintiff Lippa was involved in a car wreck and sustained physical damage to her vehicle. At the time of the car wreck, Plaintiff Lippa was contracted with Progressive Casualty for automobile insurance.

43.     Like all members of the putative Classes, each Plaintiff made a property damage claim to Defendants. Each claim submitted by Plaintiffs was determined by Progressive to be a covered claim, meaning Plaintiffs necessarily performed whatever preconditions were required to trigger entitlement to payment.

44.     Pursuant to the same policies and procedures, Defendants declared each Plaintiff's vehicle to be a total loss and purported to offer each of them the actual cash value of their loss vehicles, as they promised and represented they would under the uniform provisions of their insurance policies and New York law.

45.     When calculating their valuations and claims payments, Defendants systemically employ a routine "total loss settlement process." The process has no material differences relevant to this action, regardless of whether it involves first-party or third-party claimants or which Progressive entities were directly involved in the issuance of the relevant policy and/or adjustment of the claim. *See*, *e.g*., Exhibit 5. This process involves obtaining a "Vehicle Valuation Report"

from Mitchell and then using and relying upon the valuation provided by Mitchell to determine the benefit payment under the policy. Defendants provided a Mitchell Vehicle Valuation Report for Mr. Plotts on September 28, 2020, (Exhibit 1); for Mr. Lukasik on March 1, 2019, (Exhibit 2); for Mr. Costa on June 24, 2020, (Exhibit 3); for Mr. Goodier on June 21, 2018, (Exhibit 4), and on February 25, 2019, (Exhibit 5); for Mr. England on June 22, 2020, (Exhibit 6); for Mr. Verardo on May 2, 2017, (Exhibit 7); and for Ms. Lippa on November 6, 2020, (Exhibit 8).

46.     The Mitchell Vehicle Valuation Reports used by Defendants during the relevant period followed the same process, provided and disclosed the same or substantially the same material information, and presented that material information in the same or substantially the same format. The Vehicle Valuation Reports purport to contain values for comparable vehicles listed for sale (or, much less often, recently sold) in the claimant's geographic area. The reports also contain a purported valuation for the loss vehicle based upon these advertised prices for comparable vehicles that are listed in the report. The report adjusts the advertised prices of those comparable vehicles to account for differences in equipment, mileage, and vehicle configuration. Exhibit 1 at p. 8; Exhibit 2 at p. 7; Exhibit 3 at p. 9; Exhibit 4 at p. 10; Exhibit 5 at p. 7; Exhibit 6 at p. 7; Exhibit 7 at p. 8; Exhibit 8 at p. 8.

47.     In this action, Plaintiffs do not dispute the accuracy of the advertised prices for the comparable vehicles; Plaintiffs do not dispute that the selected comparable vehicles are a fair representation of comparable vehicles in the relevant market area; Plaintiffs do not dispute that Progressive can adjust the comparable vehicles' prices based on differences (if any) in equipment, mileage, and vehicle configuration; Plaintiffs do not dispute that Progressive accurately identifies differences (if any) in equipment, mileage, and vehicle configuration; and Plaintiffs do not dispute

the amount of the adjustments Progressive applied to account for the differences (if any) in equipment, mileage, and vehicle configuration.

48.   Said another way, aside from the PSA at issue, Plaintiffs do not challenge the Mitchell methodology for calculating the actual cash value of total-loss vehicles.

49.   The valuation reports used by Defendants, however, make a further adjustment to virtually every comparable vehicle in calculating the actual cash value of the total-loss vehicle, which Progressive calls a "Projected Sold Adjustment." For Plaintiff Plotts, the three comparable vehicles were reduced by PSA's in the amounts of, respectively, $801.00, $680.00, and $927.00, representing a reduction of 6.18% from the advertised prices. Exhibit 1 at pp. 5-6. For Plaintiff Lukasik, PSA's in the amounts of -$818.00, -$643.00, and -$819.00, respectively, were applied to the second, third, and fourth comparable vehicles, representing a reduction of 5.84% from the advertised prices. Exhibit 2 at pp. 5-6. For Plaintiff Costa, PSA's in the amounts of -$1,022.00, -$1,336.00, and -$1,247.00, respectively, were applied to each of the three comparable vehicles, representing a reduction of 4.6% from the advertised prices. Exhibit 3 at pp. 5-7. For Plaintiff Goodier's first valuation report, PSA's in the amounts of -$928.00, -$818.00, -$819.00, -$727.00, -$868.00, -$574.00, respectively, were applied to the fifth, sixth, seventh, eighth, ninth, and tenth comparable vehicles, representing a reduction of 7.9% from the advertised prices. Exhibit 4 at pp. 7-9. For Plaintiff Goodier's second valuation report, Projected Sold Adjustment in the amount of -560.00 was applied to each of the comparable vehicles, representing a reduction of 11.2% from the advertised prices. Exhibit 5 at pp. 5-6. For Plaintiff England, Projected Sold Adjustments in the amounts of -$535.00, -$350.00, -$374.00, and -$385.00, respectively, were applied to each of the four comparable vehicles, representing a reduction of 11.7% from the advertised prices. Exhibit 6 at pp. 5-6. For Plaintiff Verardo, Projected Sold Adjustments in the amounts of -$1,356.00,

-$1,139.00, -$991.00, and -$1,360.00, respectively, were applied to each of the four comparable vehicles, representing a reduction of 4.7% from the advertised prices. Exhibit 7 at pp. 5-7. For Plaintiff Lippa, Projected Sold Adjustments in the amounts of -$785.00, -$611.00, and -$611.00, respectively, were applied to the second, third, and fourth comparable vehicles, representing a reduction of 8.7% from the advertised prices. Exhibit 8 at pp. 5-6.

50.     Defendants provide no data specific to the comparable vehicles or any explanation of industry practices in their valuation reports to support *any* Projected Sold Adjustment, much less the specific downward adjustments used in Plaintiffs' valuation reports. Instead, the *only* explanation is buried on the last page of each report, stating in full: "Projected Sold Adjustment – an adjustment to reflect consumer purchasing behavior (negotiating a different price than the listed price)." Exhibit 1 at p. 8; Exhibit 2 at p. 7; Exhibit 3 at p. 9; Exhibit 4 at p. 10; Exhibit 5 at p. 7; Exhibit 6 at p. 7; Exhibit 7 at p. 8; Exhibit 8 at p. 8.

**Defendants' Projected Sold Adjustments are Deceptive and Invalid.**

51.     Defendants' Projected Sold Adjustments are deceptive. As part of a deceptive practice to lower the value of total-loss claims, Defendants do not do what they say they will do – pay actual cash value. Moreover, as described above, Defendants provide no explanation or justification for the Projected Sold Adjustment, much less the specific amount applied, other than that it "reflect[s] consumer behavior." Exhibit 1 at p. 8; Exhibit 2 at p. 7; Exhibit 3 at p. 9; Exhibit 4 at p. 10; Exhibit 5 at p. 7; Exhibit 6 at p. 7; Exhibit 7 at p. 8; Exhibit 8 at p. 8.

52.     In truth, Defendants' Projected Sold Adjustments do not reflect market realities (the context in which "consumer behavior" occurs) and run contrary to customary automobile dealer practices and inventory management, where list prices are priced to market to reflect the intense competition in the context of Internet pricing and comparison shopping. Before the ubiquity of

online advertising and shopping, "advertised" prices had very little to do with eliciting car buyers to particular dealerships—instead, car buyers generally went to their local used car dealership that had the desired vehicle in stock for sale. The "advertised" price was simply whatever price was listed on the physical window. And consumers could not, as they can now, easily compare that price to Internet advertisements of the same vehicle offered by competitors.

53.     As such, dealerships generally priced vehicles above market knowing that some consumers might be poor negotiators and they would realize an inflated profit on those sales. This above-market "window" price obviously allowed for negotiation, and a downward negotiation would often occur.

54.     But during the Class Period, ███████████████████████████ ███████████████████, that is simply no longer how the used car market operates. Now, given the need for Internet advertising, the prevalence of Internet shopping and consumer behavior, developments in sophisticated pricing software universally used by car dealerships, and the ease with which consumers can compare the advertised prices of identical vehicles across multiple competing dealerships, used car dealerships no longer price vehicles above market with room for—and the expectation of—negotiation. Instead, car dealerships use sophisticated pricing software—which provides the advertised prices of all competitors; the average "turn" of a given year, make and model; the amount for which vehicles have sold during a given time-period; etc.— and now price vehicles to market and do not negotiate from that price.

55.     This makes sense, obviously, because if a car dealership priced a vehicle above market with room for negotiation, consumers would simply not go to that dealership. This is because consumers can easily compare advertised prices, and, would seek out the vehicle priced to market, rather than the same vehicle priced at a higher amount (i.e., above market). And

obviously, given the choice between paying less or paying more for an identical vehicle, consumers will choose to pay less.

56.     As such, a negotiated discount off the cash price is highly atypical and is not proper to include in determining actual cash value. The inclusion of this significant downward adjustment purportedly to "reflect consumer purchasing behavior" is particularly improper in the context of this action—insureds who have suffered a total loss of their vehicle and need to procure a replacement have limited time to search out the illusory opportunity to obtain the below-market deal Defendants assume always exists without any explanation or support.

57.     Defendants' Projected Sold Adjustments are contrary to appraisal standards. There are multiple generally recognized and acceptable methodologies for determining actual cash value, including use of comparable vehicles. Defendants begin the process of valuing loss vehicles using the comparative methodology but improperly deviate from that process by thumbing the scales in their favor. Defendants document the loss vehicle's and each comparable vehicle's mileage, options, and trim, which are compared in the report, and make dollar adjustments accordingly. Plaintiffs do not challenge these documented adjustments. At this stage of the process, Defendants abandon the comparative methodology and apply these improper line-item Projected Sold Adjustments that are contrary to proper appraisal methodologies for determining actual cash value. Appraisers use advertised prices and only make adjustments based on observed and verifiable data; appraisal standards do not permit arbitrary adjustments from the advertised price based upon undocumented and unverifiable projections.

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████

███ ███ In other words, it is not merely that Defendants make completely unverifiable, unverified, and arbitrary assumptions; far more problematically, Defendants ████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

█████████████████

███ ███ ███████████████████████████████████████

████████████████████████████████████████

███ ███ ███████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████

███ ███ ███████████████████████████████████████

█████████████████████

███ ███ ███████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████





73.     Moreover, examples abound demonstrating the glaring error of Defendants' ▮

75.     The advertised prices many dealerships publish on these websites include discounts that would not be available to the general public or that include discounts for consumers who are financing and providing a trade-in.

76.     For example, the second comparable vehicle listed in Plaintiff Lippa's valuation report is from Garber Honda in Rochester, New York. Exhibit 8 at p. 5.

77.     Exhibit 22 shows a Cars.com advertisement from Garber Honda where the advertised price for a 2019 Honda Civic is $23,970.00.

78.     If one views the listing for that same vehicle on the dealer's website, however, the dealer discloses the price of $23,970 includes a $500 discount for financing and a $500 discount for providing a trade-in. Exhibit 23.

79.     Thus, a consumer who was not financing the vehicle through the dealership and who was not trading in a vehicle—obviously, insureds who sustained a total loss almost certainly

are not trading in a vehicle when purchasing a replacement vehicle—would have to pay in cash $1,000 *more* than the price listed on sources where ███████████████████████████████ █████ .

80.     Similarly, the second comparable vehicle listed in Plaintiff Verardo's valuation report is from Blasius South in Stratford, Connecticut. Exhibit 7 at p. 6.

81.     Listings from Blasius South make clear that "Posted internet prices include dealer finance discount of $750. Discount not available for cash or outside finance deals." Exhibit 24.

82.     There are numerous other examples of dealers advertising prices that include discounts that would not be available to the cash buyer who brings the dealer no further profit opportunities.

83.     In determining the actual *cash* value of Plaintiffs' and class members' totaled vehicle, there is no justification for Defendants ████████████████████████████ ███████████████████████████ .

84.     As another example, the advertised price of a vehicle often assumes a "loyalty discount" that most consumers will not qualify for. For example, a vehicle's advertised price might include a $2,000.00 loyalty discount. A consumer who is not a repeat customer would need to pay $2,000.00 more than the advertised price. *See, e.g.*, Exhibit 25. Such a discount is not accounted for in the list prices from █████████████████████████████ *See, e.g.*, Exhibit 26 (first advertisement).

85.     Clearly, then, there are numerous reasons why vehicles sell for more than their advertised price. ██████████████████████████████████████ ██████████████████████████████████████ .

86. 

90.     The impropriety and arbitrariness of Defendants' Projected Sold Adjustments are further demonstrated by the fact that Mitchell's primary competitor in providing valuation reports to insurance companies—CCC Intelligent Solutions—does not apply Projected Sold Adjustments. Instead, CCC Intelligent Solutions uses list prices.

91.     The impropriety and arbitrariness of Defendants' Projected Sold Adjustments are further demonstrated by the fact that Progressive Group entities do not apply these adjustments when valuing total losses in California or Washington.

92.     Instead, in these states, Progressive Group entities use the exact same methodology, without the Projected Sold Adjustment line item, and represent that amount as the actual cash value of the insured's totaled vehicle.

93.     There is no justification for reducing New York claimants' payments by the Projected Sold Adjustment, while not subjecting California and Washington claimants to this same unsupportable line-item adjustment.

**Defendants' Projected Sold Adjustments Violate Regulation 64**.

94.     The data and methodology that purportedly support the Projected Sold Adjustments in Mitchell's valuation reports are fundamentally flawed in a manner that both violates Regulation 64 and arbitrarily and improperly lowers the benefits paid to Plaintiffs and the members of the proposed classes for their total loss vehicles.

95.     Regulation 64 provides the following criteria regarding "Adjustment of total losses:"

(1) If the insurer elects to make a cash settlement, its minimum offer, subject to applicable deductions, must be one of the following:

(i) The average of the retail values for a substantially similar vehicle as listed in two valuation manuals current at the date of loss and approved by this department. Manuals approved for use are--The Redbook, published by National Market Reports Inc., and The N.A.D.A. Official Used Care Guide, published by the National Automobile Dealers Used Car Guide Company…The insurer may deduct documented, reasonable dealer preparation charges, up to $100, from the average of the retail values...

(ii) A quotation for a substantially similar vehicle, obtained by the insurer from a qualified dealer located reasonable convenient to the insured. A reasonable location shall be within 25 miles of the place of principal garagement of the motor vehicle…

(iii) A quotation obtained from a computerized database, approved by the superintendent, that produces *statistically valid* fair market values for a substantially similar vehicle, *within the local market area that meets all the following minimum criteria*:

(a) it shall produce values for at least 85 percent of all makes and models of private passenger automobiles, as defined in section 67.1(a) of this Title, for the last 15 model years, and shall take into account the values of all major options for such vehicles:

(b) it shall rely upon values derived from licensed dealers, which have minimum sales of 100 motor vehicles per year in the local market area for all vehicles of seven model years or less of age, and *be based upon the physical inventory of vehicles sold within the 90 days prior to the loss and vehicles which are available*; and

(c) it shall monitor the average retail price of private passenger automobiles when there is insufficient data or inventory available from licensed dealers to ensure statistically valid local market area values…

11 NYCCR § 216.7(c)(1)(i)-(iii) (Emphasis added).

96.     These standards are incorporated into every automobile policy providing coverage for total losses. *Trizzano v. Allstate Ins. Co.*, 7 A.D.3d 783 (2d Dep't 2004). In addition, 11 NYCRR § 216.10 ("Standards for prompt, fair and equitable settlement of third-party property damages claims arising under motor vehicle liability insurance contracts") expressly makes § 216.7(c)(1) and numerous other subsections of § 216 applicable to third-party claims.

97.     Defendants purport that the Mitchell valuation reports, and the Project Sold Adjustment, comply with the minimum criteria set forth subsection (iii) of section 216.7(c)(1). They are not compliant with these statutory requirements.

98.     As subsection (iii) states, for an insurer to rely on data obtained from a computerized database, the data must produce "statistically valid fair market values" for comparable vehicles "within the local market." Under Regulation 64, "Local market area shall mean a 100 mile radius, limited to within the United States, of the place of principal garagement of the insured's motor vehicle." 11 NYCRR § 216.7(a)(10).

99.     Additionally, the valuation for the loss vehicle must rely on values derived from licensed dealers in the local market area and must be based upon the physical inventory of vehicles actually "sold" within 90 days prior to the loss and that are actually available.

100.    Mitchell's methodology is not statistically valid. The data is not representative of the used car market in the relevant area ███████████████████████████████.

101.    *First*, as alleged above, the Projected Sold Adjustment is statistically invalid because Defendants ██████ the data used for the methodology.

102.    Specifically, data was excluded from calculations of the Projected Sold Adjustment ████████████████████████████████

██ ██ ███████████████████████████████████████████

███████████████████████████████████████████

104.    *Second*, still today, Defendants ████████████████████████████ ██████████████████████████████████████

105.    Again, as alleged above, ████████████████████████████████, as examples abound of dealers plainly disclosing on their websites that the Internet price includes financing, trade-in, and other discounts not available to the cash buyer. Without these discounts, the cash price of a vehicle will be more than the list price.

██ ██ ███████████████████████████████████████████

████████████████████████████████████████

██ ██ ███████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████



Despite recognizing that Internet prices ███████████████ Mitchell presumes—without investigation of the specific comparable or even the relevant dealer's general practices and without factual justification—

Mitchell's external marketing materials prepared for insurance companies like Defendants



113.  *Third*,

114.  *Fourth*, the Projected Sold Adjustment is calculated through misapplying

115.  The                               for the Projected Sold Adjustment estimates

data J.D. Power produced

pursuant to subpoena

118.

120.   Moreover, Defendants ████████████████████████████████████

████████████████████████████████████████████████████████████

████ ████ The data utilized to calculate the Projected Sold Adjustments applied in the

Mitchell valuation reports for Plaintiffs' loss vehicles demonstrate these flaws. ████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████

████ ████ ████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████

████ ████ For  Plaintiff  England, ████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████

124.   For  Plaintiff  Lukasik, ████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████

125.   For Plaintiff Plotts, ████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

126.    For Plaintiff Costa,



For Plaintiff Goodier,

128.    Thus, the data underpinning the Projected Sold Adjustment—an adjustment applied solely for the purpose of reducing the valuation of Defendants' claimants' vehicles—violates the requirements of Regulation 64 in a manner that damages Plaintiffs and Class members. Defendants have no justification for application of the Projected Sold Adjustments in the relevant local market areas, much less to the sales practices of the relevant dealers, much less to the Internet listings for the specific comparable vehicles utilized in their valuation reports.

**Plaintiffs and each member of the Classes were damaged by Defendants' application of Projected Sold Adjustments**

129.    Plaintiffs and each member of the classes were damaged by Defendants' application of these Projected Sold Adjustments because they were not paid the actual cash value they would have received had Defendants applied proper methodologies and appraisal standards.

130.    Were it not for this deceptive and improper adjustment, the "Base Value" in each valuation report would have been higher, resulting in a higher "settlement value" and in turn a higher payment by Defendants for actual cash value. Specifically, for Plaintiff Plotts, were it not for this deceptive and improper adjustment, the payment of actual cash value by Defendants would have been $802.67 higher, before adding the related increase in payments for applicable sales taxes. For Plaintiff Lukasik, were it not for this deceptive and improper adjustment, the payment of actual cash value by Defendants would have been $569.99 higher, before adding the related

increase in payments for applicable sales taxes. For Plaintiff Costa, were it not for this deceptive and improper adjustment, the payment of actual cash value by Defendants would have been $1,201.66 higher, before adding the related increase in payments for applicable sales taxes. For Plaintiff Goodier's first claim, were it not for this deceptive and improper adjustment, the payment of actual cash value by Defendants would have been $473.40 higher, before adding the related increase in payments for applicable sales taxes. For Plaintiff Goodier's second claim, were it not for this deceptive and improper adjustment, the payment of actual cash value by Defendants would have been $560.00 higher, before adding the related increase in payments for applicable sales taxes. For Plaintiff England, were it not for this deceptive and improper adjustment, the payment of actual cash value by Defendants would have been $411.00 higher, before adding the related increase in payments for applicable sales taxes. For Plaintiff Verardo, were it not for this deceptive and improper adjustment, the payment of actual cash value by Defendants would have been $1,211.50 higher, before adding the related increase in payments for applicable sales taxes. For Plaintiff Lippa, were it not for this deceptive and improper adjustment, the payment of actual cash value by Defendants would have been $501.75 higher, before adding the related increase in payments for applicable sales taxes [3]

## CLASS ALLEGATIONS

131.     This action is brought by Plaintiffs as a class action, on their own behalf and on behalf of all others similarly situated, under Rule 23 of the Federal Rules of Civil Procedure, for declaratory judgment and damages, plus interest, costs, and attorney's fees. Plaintiffs seek certification of this action as a class action on behalf of the following Classes:

---

[3] The dollar amount of Defendants' underpayment to each Plaintiff was calculated as the difference in the "Base Value" without application of the improper Projected Sold Adjustments and the "Base Value" as calculated by Mitchell.

**Breach of Contract Class (Against Progressive Casualty)**: All persons who made a first-party claim (which was assigned a Progressive Company Code of ██ ████████ [4] on a policy of insurance issued by any Progressive Group entity to a New York resident who, from July 28, 2015 through the date an order granting class certification is entered, received compensation for the total loss of a covered vehicle, where that compensation was based on an Instant Report prepared by Mitchell and the actual cash value was decreased based upon Projected Sold Adjustments to the comparable vehicles used to determine actual cash value.

**Breach of Contract Subclass I (Against Progressive Casualty)**: All persons who made a first-party claim (which was assigned a ████████████████████ on a policy of insurance issued by any Progressive Group entity to a New York resident who, from July 28, 2015 through the date an order granting class certification is entered, received compensation for the total loss of a covered vehicle, where that compensation was based on an Instant Report prepared by Mitchell and the actual cash value was decreased based upon Projected Sold Adjustments to the comparable vehicles used to determine actual cash value.

**Breach of Contract Subclass II (Against Progressive Casualty and Progressive Advanced)**: All persons who made a first-party claim (which was assigned a ████████████████████ on a policy of insurance issued by any Progressive Group entity to a New York resident who, from July 28, 2015 through the date an order granting class certification is entered, received compensation for the total loss of a covered vehicle, where that compensation was based on an Instant Report prepared by Mitchell and the actual cash value was decreased based upon Projected Sold Adjustments to the comparable vehicles used to determine actual cash value.

**Breach of Contract Subclass III (Against Progressive Casualty and Progressive Specialty)**: All persons who made a first-party claim (which was assigned a ████████████████████ on a policy of insurance issued by any Progressive Group entity to a New York resident who, from July 28, 2015 through the date an order granting class certification is entered, received compensation for the total loss of a covered vehicle, where that compensation was based on an Instant Report prepared by Mitchell and the actual cash value was decreased based upon Projected Sold Adjustments to the comparable vehicles used to determine actual cash value.

**Breach of Contract Subclass IV (Against Progressive Casualty and Progressive Max)**: All persons who made a first-party claim (which was assigned

---

[4] Defendants process all claims and store all claims information in a central claims system maintained by Progressive Casualty.  Internally, ████████████████████████████████████ ████████████████████████████████████ ████████

a ███████████████████████ on a policy of insurance issued by any Progressive Group entity to a New York resident who, from July 28, 2015 through the date an order granting class certification is entered, received compensation for the total loss of a covered vehicle, where that compensation was based on an Instant Report prepared by Mitchell and the actual cash value was decreased based upon Projected Sold Adjustments to the comparable vehicles used to determine actual cash value.

**Gen. Bus. Law § 349 Class (Against Progressive Casualty)**: All persons who made a claim (which was assigned a ████████████████████████ ██ on a policy of insurance issued by any Progressive Group entity to a New York resident who, from July 28, 2018 through the date an order granting class certification is entered, received compensation for the total loss of a covered vehicle, where that compensation was based on an Instant Report prepared by Mitchell and the actual cash value was decreased based upon Projected Sold Adjustments to the comparable vehicles used to determine actual cash value.

**Gen. Bus. Law § 349 Subclass I (Against Progressive Casualty)**: All persons who made a claim (which was assigned a ████████████████████████ on a policy of insurance issued by any Progressive Group entity to a New York resident who, from July 28, 2018 through the date an order granting class certification is entered, received compensation for the total loss of a covered vehicle, where that compensation was based on an Instant Report prepared by Mitchell and the actual cash value was decreased based upon Projected Sold Adjustments to the comparable vehicles used to determine actual cash value.

**Gen. Bus. Law § 349 Subclass II (Against Progressive Casualty and Progressive Advanced)**: All persons who made a claim (which was assigned a ████████████████████████ ) on a policy of insurance issued by any Progressive Group entity to a New York resident who, from July 28, 2018 through the date an order granting class certification is entered, received compensation for the total loss of a covered vehicle, where that compensation was based on an Instant Report prepared by Mitchell and the actual cash value was decreased based upon Projected Sold Adjustments to the comparable vehicles used to determine actual cash value.

**Gen. Bus. Law § 349 Subclass III (Against Progressive Casualty and Progressive Specialty)**: All persons who made a claim (which was assigned a ████████████████████████ ) on a policy of insurance issued by any Progressive Group entity to a New York resident who, from July 28, 2018 through the date an order granting class certification is entered, received compensation for the total loss of a covered vehicle, where that compensation was based on an Instant Report prepared by Mitchell and the actual cash value was decreased based upon Projected Sold Adjustments to the comparable vehicles used to determine actual cash value.

**Gen. Bus. Law § 349 Subclass IV (Against Progressive Casualty and Progressive Max)**: All persons who made a claim (which was assigned a ▓▓▓▓▓▓▓▓▓▓▓▓▓▓ on a policy of insurance issued by any Progressive Group entity to a New York resident who, from July 28, 2018 through the date an order granting class certification is entered, received compensation for the total loss of a covered vehicle, where that compensation was based on an Instant Report prepared by Mitchell and the actual cash value was decreased based upon Projected Sold Adjustments to the comparable vehicles used to determine actual cash value.

132.    Plaintiffs reserve the right to amend or modify the Class definitions.

133.    Excluded from the Classes are the Defendants, any parent, subsidiary, or control person of the Defendants, as well as the officers and directors of the Defendants and the immediate family members of any such person. Also excluded is any judge who may preside over this cause of action.

134.    **Numerosity (Rule 23(a)(1)).** The exact number of the Classes, as herein identified and described, is not known, but it is estimated to be in the thousands if not tens of thousands. Accordingly, the Classes are so numerous that joinder of individual members herein is impracticable.

135.    **Commonality (Rule 23(a)(2)).** There are common questions of law and fact in the action that relate to and affect the rights of each member of the Classes and the relief sought is common to the entire class. In particular, the common questions of law and fact include:

a.      Whether Defendants systemically used Mitchell's Vehicle Valuation Reports in adjusting total loss claims to determine actual cash value;

b.      Whether the Mitchell Vehicle Valuation Reports included Projected Sold Adjustments to the value of the comparable vehicles that reduced the base value, and thus the claim amount paid by Defendants for the actual cash value of Plaintiffs' and Class members' total loss vehicles;

      c.        Whether the Mitchell Vehicle Valuation Reports violated Regulation 64;

      d.        Whether the Projected Sold Adjustment is calculated using a statistically invalid methodology;

      e.        Whether representing to claimants that the Mitchell valuation equated with the total loss vehicle's actual cash value was deceptive;

      f.        Whether Defendants' deceptive acts and improper practices injured Plaintiffs and members of the Classes;

      g.        Whether Defendants' acts violated their obligations under the policy of insurance;

      h.        Whether Plaintiffs and the Classes are entitled to compensatory damages, and if so, the calculation of damages; and

      i.        Whether Plaintiffs and members of the Classes are entitled to an injunction restraining Progressive's future deceptive acts and practices.

136.    **Typicality (Rule 23(a)(3)).** The claims of the Plaintiffs, who are representative of the Classes herein, are typical of the claims of the proposed Classes, in that the claims of all members of the proposed Classes, including the Plaintiffs, depend on a showing of the acts of Progressive giving rise to the right of Plaintiffs to the relief sought herein. There is no conflict between the individually named Plaintiffs and the other members of the proposed Classes with respect to this action, or with respect to the claims for relief set forth herein.

137.    **Adequacy (Rule 23(a)(4)).** The named Plaintiffs are the representative parties for the Classes, and are able to, and will fairly and adequately, protect the interests of the Classes. The attorneys for the Plaintiffs and the Classes are experienced and capable in complex civil litigation, insurance litigation, and class actions.

138.     **Predominance & Superiority (Rule 23(b)(3)).** Class certification is appropriate under Rule 23 because the common questions of law and fact in this case predominate over questions affecting only individual members of the Classes, and a class action is the superior method for fair and efficient adjudication of the controversy. The likelihood that individual members of the Classes will prosecute separate action is remote due to the time and expense necessary to conduct such litigation. The class action procedure would permit a large number of injured persons to prosecute their common claims in a single forum simultaneously, efficiently, and without unnecessary duplication of evidence and effort. Class treatment also would permit the adjudication of claims by class members who claims are too small and complex to individually litigate against a large corporate defendant.

139.     **Final Declaratory or Injunctive Relief (Rule 23(b)(2)).** Plaintiffs also satisfy the requirements for maintaining a class action under Rule 23(b)(2). Defendant has acted or refused to act on grounds that apply generally to the proposed Classes, making final declaratory or injunctive relief appropriate with respect to the proposed Classes as a whole.

140.     **Particular Issues (Rule 23(c)(4)).** Plaintiffs also satisfy the requirements for maintaining a class action under Rule 23(c)(4). Their claims consist of particular issues that are common to all members of the Classes and are capable of class-wide resolution that will significantly advance the litigation.

### FIRST CAUSE OF ACTION
### BREACH OF CONTRACT
(ON BEHALF OF PLAINTIFFS PLOTTS, LUKASIK, COSTA, GOODIER, VERARDO, LIPPA, AND MEMBERS OF THE BREACH OF CONTRACT CLASS AND THE BREACH OF CONTRACT SUBCLASS I, SUBCLASS II, SUBCLASS III, AND SUBCLASS IV)

141.     Plaintiffs hereby repeat and reallege all preceding paragraphs contained herein.

142.     This cause of action is asserted on behalf of Plaintiffs Plotts, Lukasik, Costa, Goodier, Verardo, Lippa, and members of the Breach of Contract class against Progressive Casualty. This cause of action is asserted on behalf of Plaintiff Lukasik, Plaintiff Lippa, and members of the Breach of Contract Subclass I against Progressive Casualty. This cause of action is asserted on behalf of Plaintiff Plotts, Plaintiff Goodier, and members of the Breach of Contract Subclass II against Progressive Casualty and Progressive Advanced. This cause of action is asserted on behalf of Plaintiff Costa and members of the Breach of Contract Subclass III against Progressive Casualty and Progressive Specialty. This cause of action is asserted on behalf of Plaintiff Verardo and members of the Breach of Contract Subclass IV against Progressive Casualty and Progressive Max.

143.     Plaintiffs Plotts, Lukasik, Costa, Goodier, Verardo, and Lippa each made a claim for property damage on his Progressive insurance policy.

144.     At the time of his claim, Plaintiff Plotts was party to an insurance contract requiring Progressive Casualty and Progressive Advanced to handle, adjust, and pay insureds the actual cash value of their total loss claim.

145.     Before making his claim, and in the time since, Plaintiff Plotts has performed all obligations under his policy of insurance and was entitled to the benefits he contracted for in that policy.

146.     At the time of his claim, Plaintiff Lukasik was party to an insurance contract requiring Progressive Casualty to handle, adjust, and pay insureds the actual cash value of their total loss claim.

147.    Before making his claim, and in the time since, Plaintiff Lukasik has performed all obligations under his policy of insurance and was entitled to the benefits he contracted for in that policy.

148.    At the time of his claim, Plaintiff Costa was party to an insurance contract requiring Progressive Casualty and Progressive Specialty to handle, adjust, and pay insureds the actual cash value of their total loss claim.

149.    Before making his claim, and in the time since, Plaintiff Costa has performed all obligations under his policy of insurance and was entitled to the benefits he contracted for in that policy.

150.    At the time of his claims, Plaintiff Goodier was party to an insurance contract requiring Progressive Casualty and Progressive Advanced to handle, adjust, and pay insureds the actual cash value of their total loss claim.

151.    Before making his claim, and in the time since, Plaintiff Goodier has performed all obligations under his policy of insurance and was entitled to the benefits he contracted for in that policy.

152.    At the time of his claim, Plaintiff Verardo was party to an insurance contract requiring Progressive Casualty and Progressive Max to handle, adjust, and pay insureds the actual cash value of their total loss claim.

153.    Before making his claim, and in the time since, Plaintiff Verardo has performed all obligations under his policy of insurance and was entitled to the benefits he contracted for in that policy.

154.    At the time of her claim, Plaintiff Lippa was party to an insurance contract requiring Progressive Casualty to handle, adjust, and pay insureds the actual cash value of their total loss claim.

155.    Before making her claim, and in the time since, Plaintiff Lippa has performed all obligations under her policy of insurance and was entitled to the benefits he contracted for in that policy.

156.    Through the use of improper and unfounded Projected Sold Adjustments in Mitchell vehicle valuation reports, as detailed above, Defendants Progressive Casualty, Progressive Advanced, Progressive Specialty, and Progressive Max handled, adjusted, and paid Plaintiff Plotts's claim, Plaintiff Lukasik's claim, Plaintiff Costa's claim, Plaintiff Goodier's claim, Plaintiff Verardo's claim, Plaintiff Lippa's claim, and the claims of the members of the proposed Breach of Contract Class and Subclasses, for less than the actual cash value required by the insurance contract.

157.    As a direct result of Defendants Progressive Casualty's, Progressive Advanced's, Progressive Specialty's, and Progressive Max's breaches, Plaintiffs Plotts, Lukasik, Costa, Goodier, Verardo, Lippa, and members of the Breach of Contract Class and Subclasses sustained actual damages. Plaintiff Plotts's damages are at least $802.67 (before calculation of additional sales tax benefits), plus pre-judgment and post-judgment interest. Plaintiff Lukasik's damages are at least $569.99 (before calculation of additional sales tax benefits), plus pre-judgment and post-judgment interest. Plaintiff Costa's damages are at least $1,201.66 (before calculation of additional sales tax benefits), plus pre-judgment and post-judgment interest. Plaintiff Goodier's damages are at least $1,033.40 (before calculation of additional sales tax benefits), plus pre-judgment and post-judgment interest. Plaintiff Verardo's damages are at least $1,211.50 (before calculation of

additional sales tax benefits), plus pre-judgment and post-judgment interest. Plaintiff Lippa's damages are at least $501.75 (before calculation of additional sales tax benefits), plus pre-judgment and post-judgment interest.

**SECOND CAUSE OF ACTION**
**VIOLATION OF N.Y. GEN. BUS. LAW § 349**
(ON BEHALF OF PLAINTIFFS AND MEMBERS OF THE GEN. BUS. LAW § 349 CLASS AND THE GEN. BUS. LAW § 349 SUBCLASS I, SUBCLASS II, SUBCLASS III, AND SUBCLASS IV)

158.    Plaintiffs hereby repeat and reallege all preceding paragraphs contained herein.

159.    This cause of action is asserted on behalf of Plaintiffs and members of the Gen. Bus. Law § 349 Class against Progressive Casualty. This cause of action is asserted on behalf of Plaintiff Lukasik, Plaintiff Lippa, and members of the Gen. Bus. Law § 349 Subclass I against Progressive Casualty. This cause of action is asserted on behalf of Plaintiff Plotts, Plaintiff Goodier, and members of the Gen. Bus. Law § 349 Subclass II against Progressive Casualty and Progressive Advanced. This cause of action is asserted on behalf of Plaintiff Costa, Plaintiff England, and members of the Gen. Bus. Law § 349 Subclass III against Progressive Casualty and Progressive Specialty. This cause of action is asserted on behalf of Plaintiff Verardo and members of the Gen. Bus. Law § 349 Subclass IV against Progressive Casualty and Progressive Max.

160.    Plaintiffs made claims for property damage to Progressive.

161.    New York General Business Law § 349(a) provides: "Deceptive acts or practices in the conduct of any business, trade or commerce in the furnishing of any service in this state are hereby declared unlawful."

162.    The acts and practices alleged herein are deceptive and were carried out in the conduct of Defendants' business. The use of unfounded and arbitrary Projected Sold Adjustments as a means of undervaluing claimants' total loss claims has the capacity to and does deceive and

injure consumers. Defendants do not do what their policies says they will do – pay actual cash value. Moreover, as described above, Defendants provide no explanation or justification for the Projected Sold Adjustment, much less the specific amount applied, other than the vague and unsupported speculation that it purportedly "reflect[s] consumer behavior."

163.     Moreover, this explanation is deceptive and misleading because Defendants ███████████████ data that contradict the Projected Sold Adjustment but nonetheless "reflect[s] consumer purchasing behavior."

164.     Defendants used these unsupported misrepresentations about "consumer purchasing behavior" to systematically undervalue and, in turn, underpay Plaintiffs' total loss claims as well as the total loss claims of members of the proposed Gen. Bus. Law § 349 Class and Subclasses.

165.     Defendants used valuation reports that systematically misrepresent and undervalue the actual cash value of claimants' loss vehicles. The reports make Projected Sold Adjustments that are arbitrary and unfounded. These adjustments are used to reduce the valuation of claimants' loss vehicles. Defendants, in turn, use these reports as the basis for offering claimants what they, deceptively, purport to be the actual cash value of the totaled vehicles.

166.     Here, Defendants misrepresented the actual cash value of each Plaintiffs totaled vehicle, paying, before calculation of additional sales tax benefits, Plaintiff Plotts at least $802.67 less than the actual cash value to which he was entitled, Plaintiff Lukasik at least $569.99 less than the actual cash value to which he was entitled, Plaintiff Costa at least $1,201.66 less than the actual cash value to which he was entitled, Plaintiff Goodier at least $1,033.40 less than the actual cash value to which he was entitled, Plaintiff England at least $411.00 less than the actual cash value to which he was entitled, Plaintiff Verardo at least$1,211.50 less than the actual cash value to which

he was entitled, and Plaintiff Lippa at least $501.75 less than the actual cash value to which she was entitled.

167.     As a result of Defendants' actions, Plaintiffs and members of the Gen. Bus. Law § 349 Class and Subclasses incurred damages, including actual damages in the amount their loss vehicle valuations were reduced through the use of Projected Sold Adjustments, applicable tax calculation adjustments, statutory damages under N.Y. Gen. Bus. Law § 349(h) where applicable, treble damages up to $1,000 under N.Y. Gen. Bus. Law § 349(h) where applicable, and pre-judgment interest.

168.     Plaintiffs and members of the N.Y. Gen. Bus. Law § 349 Class and Subclasses are entitled to reasonable attorney's fees upon prevailing pursuant to Gen. Bus. Law § 349(h).

### THIRD CAUSE OF ACTION
### DECLARATORY JUDGMENT
#### (ON BEHALF OF ALL PLAINTIFFS AND ALL CLASSES AND SUBCLASSES)

169.     Plaintiffs hereby repeat and reallege all preceding paragraphs contained herein.

170.     This cause of action is asserted on behalf of Plaintiffs Plotts, Lukasik, Costa, Goodier, Verardo, Lippa and members of the Breach of Contract class against Progressive Casualty. This cause of action is asserted on behalf of Plaintiff Lukasik, Plaintiff Lippa, and members of the Breach of Contract Subclass I against Progressive Casualty. This cause of action is asserted on behalf of Plaintiff Plotts, Plaintiff Goodier, and members of the Breach of Contract Subclass II against Progressive Casualty and Progressive Advanced. This cause of action is asserted on behalf of Plaintiff Costa and members of the Breach of Contract Subclass III against Progressive Casualty and Progressive Specialty. This cause of action is asserted on behalf of Plaintiff Verardo and members of the Breach of Contract Subclass IV against Progressive Casualty and Progressive Max. This cause of action is asserted on behalf of Plaintiffs and members of the

Gen. Bus. Law § 349 Class against Progressive Casualty. This cause of action is asserted on behalf of Plaintiff Lukasik, Plaintiff Lippa, and members of the Gen. Bus. Law § 349 Subclass I against Progressive Casualty. This cause of action is asserted on behalf of Plaintiff Plotts, Plaintiff Goodier, and members of the Gen. Bus. Law § 349 Subclass II against Progressive Casualty and Progressive Advanced. This cause of action is asserted on behalf of Plaintiff Costa, Plaintiff England, and members of the Gen. Bus. Law § 349 Subclass III against Progressive Casualty and Progressive Specialty. This cause of action is asserted on behalf of Plaintiff Verardo and members of the Gen. Bus. Law § 349 Subclass IV against Progressive Casualty and Progressive Max.

171.    A dispute between Plaintiffs and the Classes and Progressive is before this Court under New York law concerning the construction of Regulation 64 and whether the methodology used to calculate Projected Sold Adjustments violates Regulation 64.

172.    Defendants' unlawful common policy and general business practice as described herein are ongoing. Accordingly, as detailed above, Defendants have violated, and continue to violate, Regulation 64 by basing the calculation of Projected Sold Adjustments ███████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ██████████████████████████████.

173.    Plaintiffs, therefore, seek a declaration on behalf of themselves and the Classes they represent that Defendants' application of Projected Sold Adjustments violates Regulation 64 and injunctive relief flowing from that declaration.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, respectfully request that this Court:

a)      determine that this action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, certify the proposed Classes for class treatment, appoint Plaintiffs as class representatives for each class, and appoint undersigned counsel as Class Counsel;

b)      enter an order finding that Defendants' actions described herein constitute breaches of the express terms of its policies of insurance;

c)      enter a declaratory judgment that the methodology used for calculating Projected Sold Adjustments violates Regulation 64 and appropriate injunctive relief flowing from that declaration;

d)      enter an order finding that Defendants' actions described herein constitute violations of N.Y. Gen. Bus. Law § 349;

e)      award Plaintiffs and members of the Classes actual damages according to proof;

f)      award Plaintiffs and members of the Gen. Bus. Law §349 Class and Gen. Bus. Law §349 Subclasses, alternatively, statutory damages and treble damages up to $1,000 pursuant to N.Y. Gen. Bus. Law § 349(h);

g)      enter an injunction restraining Defendants' use of deceptive and unfounded Projected Sold Adjustments in determining the actual cash value of total loss vehicles;

h)      award pre-judgment and post-judgment interest at the maximum rate permitted by applicable law;

i)      award reasonable attorney's fees and litigation costs and expenses pursuant to applicable law, including N.Y. Gen. Bus. Law § 349(h); and

j)      grant such other legal and equitable relief as the Court may deem appropriate, including specific performance as an alternative to damages.

## **DEMAND FOR JURY TRIAL**

Plaintiffs demand a jury trial on all issues so triable.

Dated: April 15, 2022                    Respectfully submitted,

/s/ Hank Bates
Hank Bates (admitted *pro hac vice*)
Tiffany Oldham (admitted *pro hac vice*)
Lee Lowther (admitted *pro hac vice*)
Jake G. Windley (admitted *pro hac vice*)
**CARNEY BATES & PULLIAM, PLLC**
519 W. 7th Street
Little Rock, Arkansas 72201
Telephone: 501-312-8500
Fax: 501-312-8505
hbates@cbplaw.com
toldham@cbplaw.com
llowther@cbplaw.com
jwindley@cbplaw.com

And

Thomas M. Mullaney (TM-4274)
**THE LAW OFFICE OF THOMAS M. MULLANEY**
530 Fifth Ave—23 Floor
New York, New York 10036
Telephone: 212-223-0800
Fax: 212-661-9860
tmm@mullaw.org

And

Andrew J. Shamis (NY #5195185)
**SHAMIS & GENTILE, P.A.**
14 NE First Avenue, Suite 705
Miami, Florida 33132
Telephone: 305-479-2299
ashamis@shamisgentile.com

Rachel Dapeer, Esq. (NY #4995130)
**DAPEER LAW, P.A.**

20900 NE 30th Ave, Suite 417
Aventura, Florida 33180
Telephone: 305-610-5223
rachel@dapeer.com

Scott Edelsberg (admitted *pro hac vice*)
Christopher Gold (admitted *pro hac vice*)
**EDELSBERG LAW, PA**
20900 NE 30th Ave, Suite 417
Aventura, Florida 33180
Telephone: 305-975-3320
scott@edelsberglaw.com
chris@edelsberglaw.com

        And

Jacob L. Phillips (admitted *pro hac vice*)
**NORMAND PLLC**
3165 McCrory Place, Suite 175
Orlando, FL 32803
Telephone: (407) 603-6031
jacob.phillips@normandpllc.com
ean@normandpllc.com

## CERTIFICATE OF SERVICE

        I certify that on April 15, 2022, I electronically transmitted the foregoing document with the Clerk of the Court using the CM/ECF system, which will provide electronic mail notice to all counsel of record.

                    */s/ Hank Bates*
                    Hank Bates