UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------ X
                                                             :
DOMINICK VOLINO, et al.,                                     :
                                    Plaintiffs,              :
                                                             :           21 Civ. 6243 (LGS)
                -against-                                     :
                                                             :
PROGRESSIVE CASUALTY INSURANCE                               :
COMPANY, et al.,                                             :
                                    Defendants. :
------------------------------------------------------------ X
                                                             :
MICHAEL VERARDO, et al.,                                     :
                                    Plaintiffs,              :
                                                             :           22 Civ. 1714 (LGS)
                -against-                                     :
                                                             :         **OPINION AND ORDER**
PROGRESSIVE CASUALTY INSURANCE                               :
COMPANY, et al.,                                             :
                                    Defendants. :
------------------------------------------------------------ X

LORNA G. SCHOFIELD, District Judge:

        This case concerns insureds' claims that their auto insurers systematically paid them less

than the actual cash value of their vehicles for total loss claims, in breach of their policies.  All

Plaintiffs -- John Plotts, Kevin Lukasik, Lorenzo Costa, Zachary Goodier, James England,

Michael Verardo and Lori Lippa -- assert claims of deceptive practices in violation of New York

General Business Law ("GBL") § 349 and seek a declaratory judgment on behalf of themselves

and a putative class (the "GBL § 349 Class").  All Plaintiffs except England (the "First-Party

Plaintiffs") assert claims for breach of contract on behalf of themselves and a putative class (the

"Breach of Contract Class").  Both sets of claims are asserted against all Defendants --

Progressive Advanced Insurance Company ("Progressive Advanced"), Progressive Specialty

Insurance Company ("Progressive Specialty"), Progressive Max Insurance Company

("Progressive Max") and Progressive Casualty Insurance Company ("Progressive Casualty" and, collectively with the other Defendants, "Progressive").

The Breach of Contract Class is defined as follows:

> All persons who made a first-party claim (which was assigned a Progressive Company Code [that corresponds to one of the Defendants]) on a policy of insurance issued by any Progressive Group entity to a New York resident who, from July 28, 2015 through the date an order granting class certification is entered, received compensation for the total loss of a covered vehicle, where that compensation was based on an Instant Report prepared by [non-party Mitchell International, Inc. ("Mitchell")] and the actual cash value was decreased based upon Projected Sold Adjustments to the comparable vehicles used to determine actual cash value.

The GBL § 349 Class differs only in its class period and in its inclusion of third-party claims in addition to first-party claims, and is defined as follows:

> All persons who made a claim (which was assigned a Progressive Company Code [that corresponds to one of the Defendants]) on a policy of insurance issued by any Progressive Group entity to a New York resident who, from July 28, 2018 through the date an order granting class certification is entered, received compensation for the total loss of a covered vehicle, where that compensation was based on an Instant Report prepared by Mitchell and the actual cash value was decreased based upon Projected Sold Adjustments to the comparable vehicles used to determine actual cash value.

Plaintiffs move to certify both classes under Federal Rule of Civil Procedure 23(b)(3) -- or if not 23(b)(3), then Rule 23(b)(2) -- and seek appointment of class counsel pursuant to Rule 23(g).  Plaintiffs also move to certify four subclasses of each class, one for each Defendant, defined with reference to each Defendant's Progressive Company Code.  For the reasons below, certification of the Breach of Contract Class and the GBL § 349 Class and their subclasses is granted.  Plaintiffs' motion for appointment of class counsel is granted in part and denied in part.

Progressive cross-moves to exclude the opinions of Plaintiffs' experts, Jason Merritt, Kenneth Volz and Thomas Gibbs.  These motions are denied.

I.      BACKGROUND

Familiarity with the underlying facts and procedural history is assumed.  *See Volino v. Progressive Cas. Ins. Co.*, No. 21 Civ. 6243, 2022 WL 5242894, at *1 (S.D.N.Y. Oct. 6, 2022). The facts below are taken from the Consolidated Amended Complaint and the parties' submissions on these motions.

Each First-Party Plaintiff was involved in a car wreck while he or she was the insured on an auto insurance policy issued by one of the Defendants (a "Progressive Policy").  Plaintiff England was involved in a wreck with another driver who was the insured on a Progressive Policy.  Progressive declared each of Plaintiffs' vehicles to be a total loss.  Each Progressive Policy included a promise that Progressive would pay the respective Plaintiff the "actual cash value" of her or his car in the event of a total loss.

Progressive used vehicle valuation reports created by non-party Mitchell ("Mitchell Reports") and its WorkCenter Total Loss software ("WCTL"), as part of Progressive's "total loss settlement process" of calculating actual cash value.  In general, Progressive is permitted, by New York law and by the Progressive Policies, to use a third-party database to calculate amounts owed under the Policies, subject to certain conditions.  According to Progressive, its valuation methodology employs the prices of comparable vehicles in a multi-step process.

First, Progressive's methodology looks to the prices of several comparable vehicles recently sold or listed for sale in the insured's local market area.  Those prices are adjusted based on differences in mileage, equipment, configuration, etc., between the comparable vehicles and the insured's vehicle.  The adjustments may be upward or downward based on real-world data regarding the impact on market value of variables like mileage and vehicle features.

3

Progressive then applies a "Projected Sold Adjustment" ("PSA"), which Plaintiffs challenge in this action.  Progressive contends that the PSA reasonably estimates the reduction to list price needed to project the sales price of a vehicle after negotiation.  The PSA is calculated by comparing the prices at which other similar vehicles were listed and then ultimately sold. Progressive applies the PSA to the list prices of unsold comparable vehicles, unless those vehicles are advertised by dealers that advertise "no-haggle" prices.  Because the PSA is calculated based on vehicles similar to a particular insured's vehicle, the PSA may be different each time.  Plaintiffs contend that Progressive cherry-picks the vehicles used to calculate the PSA, manipulating the dataset to produce a much larger downward adjustment in price than is warranted by current market realities.  Plaintiffs argue that the PSA reflects an outdated view of the used-car market based on haggling, while in reality, widespread, immediate access to price information via the Internet has made such negotiation obsolete.

After applying the PSA, Progressive applies an adjustment (upward or downward) for the pre-loss condition of the insured's vehicle, and adjustments for prior damage, aftermarket parts and title history.  If the insured chooses to retain her or his totaled vehicle rather than transferring title to Progressive, the salvage value also is deducted from the cash value payable to the car owner.

After calculating the "actual cash value," Progressive does not automatically cut a check for that amount (after taxes, fees and any deductible).  Some insureds dispute their settlement amount and negotiate a higher payment.  According to Progressive, these negotiations typically are not reflected in Progressive's data and would be apparent only through a manual review of claim files.

## II.    EXPERT TESTIMONY

### A.    Standard

Federal Rule of Evidence 702, which governs admissibility of expert testimony, provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if [] (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

District courts play a "'gatekeeping' function" under Rule 702 and are "charged with 'the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand.'"  *In re Mirena IUS Levonorgestrel-Related Prods. Liab. Litig. (No. II)*, 982 F.3d 113, 122-23 (2d Cir. 2020) (quoting *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993)).  A Rule 702 inquiry focuses on three issues: (1) whether a witness is qualified as an expert, (2) whether the witness's "opinion is based upon reliable data and methodology" and (3) whether "the expert's testimony (as to a particular matter) will assist the trier of fact."  *Nimely v. City of New York*, 414 F.3d 381, 397 (2d Cir. 2005) (cleaned up); *see also In re Namenda Indirect Purchaser Antitrust Litig.*, 338 F.R.D. 527, 543 (S.D.N.Y. 2021).  "[A] slight modification of an otherwise reliable method will not render an expert's opinion *per se* inadmissible."  *United States v. Jones*, 965 F.3d 149, 160 (2d Cir. 2020) (internal quotation marks omitted).  The party proffering the expert bears the burden of establishing Rule 702's requirements by a preponderance of the evidence.  *Id.* at 161.

The *Daubert* and Rule 702 concepts of "gatekeeping" and admissibility are ill suited for a class certification motion, which is determined by the Court.  There is no admission or exclusion of testimony before a jury and no "gate" requiring threshold reliability determinations.  In sum,

every objection goes to the weight of the testimony.  The Supreme Court has offered "limited

dicta suggesting that a *Daubert* analysis may be required at least in some circumstances."  *In re*

*U.S. Foodservice Inc. Pricing Litig.*, 729 F.3d 108, 129 (2d Cir. 2013); *accord In re Aluminum*

*Warehousing Antitrust Litig.*, 336 F.R.D 5, 28-29 (S.D.N.Y. 2020).  Progressive's request to file

*Daubert* motions in conjunction with their opposition to class certification was granted, with the

caveat that the Court did not intend to rule on the admissibility of expert testimony other than for

purposes of class certification.  The parties were directed to tailor their arguments accordingly,

and their arguments are addressed only as necessary to resolve the class certification motion.

      **B.**    **Progressive's *Daubert* Motions**

     Progressive seeks to preclude the opinions of three experts whose reports were filed in

support of Plaintiffs' summary judgment motion:  Jason Merritt, Thomas M. Gibbs, Jr. and

Kenneth Volz.  Progressive's motion is denied as to each.

      **1.  Jason Merritt**

     Progressive's motion to preclude Jason Merritt's expert opinion is denied.  Mr. Merritt is

qualified by long experience to opine on how car appraisals typically are conducted.  He has

regularly appraised vehicles for at least five years for three different organizations.  At least two

of those businesses are in the business of acquiring and selling cars, and thus their profitability

depends on accurate appraisals.  For much of his time as an appraiser, Merritt was not formally

certified, but he is now trained and certified by the Bureau of Certified Auto Appraisers.  While

Merritt's "formal education" in appraisal is limited, his "background and practical experience

qualify as 'specialized knowledge' gained through 'experience, training or education.'"

*McCullock v. H.B. Fuller Co.*, 61 F.3d 1038, 1043 (2d Cir. 1995) (quoting Fed. R. Evid. 702);

*accord Lickteig v. Cerberus Cap. Mgmt., L.P.*, 589 F. Supp. 3d 302, 328 (S.D.N.Y. 2022).

Progressive's argument that Merritt lacks any "experience whatsoever in the design of valuation software" is irrelevant because Merritt did not opine on software design.

Most of Merritt's opinions that Progressive challenges bear a close connection to his evident qualifications.  In most cases, Merritt "explain[ed] how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts."  Fed. R. Evid. 702 advisory committee's note to 2000 amendment; *see Lickteig*, 589 F. Supp. 3d at 328-29.  For example, Merritt explained that, in his experience applying the "comparable" or "comp" methodology, an appraiser applies many of the adjustments that Progressive purports to apply, in the way Progressive purports to apply them.  Merritt's opinions that Progressive's methodology generally comports with the appraisal methodologies with which he has experience are reliable, helpful and admissible.  That Merritt did not cite specific, documented appraisal standards goes to the weight, not the admissibility of his testimony.  *McCullock*, 61 F.3d at 1044 ("Disputes as to the strength of his credentials . . . or lack of textual authority for his opinion, go to the weight, not the admissibility, of his testimony." (citing *Daubert*, 509 U.S. at 596)).  Merritt did not offer a novel methodology that broke with common practice, which might require more specific foundation.  *Cf. Davis v. Carroll*, 937 F. Supp. 2d 390, 415-16 (S.D.N.Y. 2013) ("[N]ovelty is not a sufficient basis for the exclusion of a proposed expert methodology . . . .  But it is a basis for skepticism and caution . . . .").

Similarly, Merritt sufficiently grounded in his experience his opinion that appraisers generally do not apply PSA-like adjustments without a specific reason to think a particular dealer would sell a particular car below list price on a particular day.  Because Merritt opined that an appraiser would not apply the PSA as Progressive does but would apply all of the other adjustments in the "comp" methodology, Merritt's opinion that a proper appraisal could consist

of Progressive's methodology minus the PSA is reliable and helpful.  Merritt did not, and likely could not, opine on how the WCTL software or calculations should be adjusted to calculate damages in that way.  Plaintiffs rely on a different expert to do so.  It is unnecessary to address Progressive's challenges to Merritt's other opinions -- including about the prevalence of "no-haggle" prices, the reasons why cars sell below list price and the lack of "hard data" underlying the PSA -- because they are not relevant or relied upon for purposes of class certification.

### 2.  Thomas M. Gibbs, Jr. and Kenneth Volz

Progressive's challenge to testimony by Gibbs and Volz, both of whom opined on how car dealers price used cars, is denied.  Gibbs and Volz, like Merritt, are qualified by their "background[s] and practical experience."  *McCullock*, 61 F.3d at 1043.  Gibbs has been involved in the new- and used-car sales business for more than fifty years, including managing and operating car dealerships for many years and, more recently, running a used-car sales consulting business.  Volz has owned and run a used car dealership for nearly twenty-five years.

Both Gibbs and Volz are qualified to testify based on their own direct experience with pricing vehicles, and both of their reports "explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts," in reaching somewhat broader conclusions about the industry at large.  Fed. R. Evid. 702 advisory committee's note to 2000 amendment; *see Lickteig*, 589 F. Supp. 3d at 328-29.  Gibbs has been a consultant for almost twenty years, during the whole period in which he claims the industry has shifted away from a negotiation-based to a price-to-market model.  Gibbs thus took a broad view of the market and supported his opinions with a citation to an industry publication and references to specific software products offered by his competitors.  Volz has been running his own dealership throughout that period, and he supported

8

his opinions based on his experience pricing vehicles to sell in a competitive market.  Volz

opined that if he priced his vehicles higher with the assumption that he would then negotiate the

price down, there would never be a negotiation because buyers would see his higher list prices

and take their business elsewhere.  Both Gibbs and Volz, based on their respective decades-long

experience, are qualified to opine about possible reasons, other than negotiation, that a vehicle

might sell below list price, such as financing, warranties, service contracts, etc.

Again, it is unnecessary to address Progressive's challenges to other aspects of Gibbs's

and Volz's opinions.  For example, to the extent Gibbs and Volz attempted to opine that

particular reasons for below-list-price sales are "likely," to extrapolate their experiences to every

dealer and every sale in the industry or to opine on the inner workings of the WCTL software,

those conclusions are superfluous for purposes of class certification and are not relied upon.

## III.   PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

Certification of both classes is granted under Rule 23(b)(3) because Plaintiffs have

established that each of the Rule 23(a) prerequisites is met, and that common issues predominate

over individualized issues, that a class action is superior to other available methods of fairly and

efficiently adjudicating the controversy and that each proposed class is ascertainable.

### A.   Rule 23

Federal Rule of Civil Procedure 23(a) provides:

One or more members of a class may sue or be sued as representative parties on
behalf of all members only if: (1) the class is so numerous that joinder of all
members is impracticable; (2) there are questions of law or fact common to the
class; (3) the claims or defenses of the representative parties are typical of the
claims or defenses of the class; and (4) the representative parties will fairly and
adequately protect the interests of the class.

Where, as here, class certification is sought pursuant to Rule 23(b)(3), a plaintiff must

also show (1) "that the questions of law or fact common to class members predominate over any

questions affecting only individual members," (the "predominance" requirement) and "that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy" (the "superiority" requirement).  Fed. R. Civ. P. 23(b)(3).  The Second Circuit "has also recognized an implied requirement of ascertainability in Rule 23, which demands that a class be sufficiently definite so that it is administratively feasible for the court to determine whether a particular individual is a member."  *In re Petrobras Sec.*, 862 F.3d 250, 260, 268-69 (2d Cir. 2017) (internal quotation marks and citation omitted).

"The party seeking class certification bears the burden of establishing by a preponderance of the evidence that each of Rule 23's requirements have been met."  *Johnson v. Nextel Commc'ns Inc.*, 780 F.3d 128, 137 (2d Cir. 2015); *accord Gil v. Pizzarotti, LLC*, No. 19 Civ. 3497, 2022 WL 970514, at *3 (S.D.N.Y. Mar. 31, 2022).  Although "a court's class-certification analysis must be rigorous and may entail some overlap with the merits of the plaintiff's underlying claim, Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage."  *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 465–66 (2013) (cleaned up).  Although factual disputes relevant to Rule 23's requirements must be resolved, a court "should not assess any aspect of the merits unrelated to a Rule 23 requirement."  *In re Initial Pub. Offerings Sec. Litig.*, 471 F.3d 24, 41 (2d Cir. 2006); *accord Buffington v. Progressive Advanced Ins. Co.*, 342 F.R.D. 66, 70 (S.D.N.Y. 2022).  Since both classes are certified under Rule 23(b)(3), Rule 23(b)(2) is not addressed.

### B.    Analysis

Progressive disputes each requirement for class certification except for numerosity, commonality and superiority.  Each is addressed in turn below.

### 1.  Ascertainability

The two classes and each of their subclasses are ascertainable.  The criteria for class membership -- whether a person submitted a claim, based on a policy issued by a Defendant to a New York resident, during a certain period, where the payment was based on a Mitchell Report, which included a PSA -- are "objective criteria that establish a membership with definite boundaries."  *In re Petrobras*, 862 F.3d at 257.  Progressive argues that review of individual settlement files may be necessary to determine, for example, whether a payment was based on a Mitchell Report or rather negotiated.  That may be relevant to predominance, as discussed below, but does not defeat ascertainability because the criteria are both objective and definite. Ascertainability is not a "freestanding administrative feasibility requirement."  *Id.* at 264.

### 2.  Numerosity

Both classes and all of the subclasses are "so numerous that joinder of all members is impracticable."  Fed. R. Civ. P. 23(a)(1).  Using Progressive's claims data, Plaintiffs' expert estimated the size of each class and subclass within a small margin for error, and each contains at least several thousand individuals.  *Jin v. Shanghai Original, Inc.*, 990 F.3d 251, 263 n.20 (2d Cir. 2021) ("[N]umerosity is generally 'presumed at a level of 40 [or more] members.'").  One criterion -- whether a PSA was in fact applied when calculating the class member's "actual cash value" -- is not incorporated into those estimates, because it is not obvious from Progressive's aggregate data.  Progressive does not dispute Plaintiffs' expert's estimate, based on sampling, that only a small proportion of all claims will not have had any PSA applied.  Therefore, all of the subclasses still easily clear the low bar set for numerosity.

11

### 3.  Commonality

Progressive does not expressly dispute that there are at least some "questions of law or fact common to the class."  Fed. R. Civ. P. 23(a)(2).  To the extent Progressive's arguments sound in commonality, they are "subsumed under, or superseded by, the more demanding predominance requirement of Rule 23(b)(3)," and are addressed in that section below.  *In re Namenda*, 338 F.R.D. at 547.

### 4.  Typicality

Contrary to Progressive's argument, the named Plaintiffs' claims, and Progressive's related defenses, are typical of the class as a whole.  Fed. R. Civ. P. 23(a)(3).  Progressive asserts that all of the named Plaintiffs are atypical but elaborates on that argument as to only two:  Lippa and Lukasik.  First, Progressive argues that some kind of typicality problem arises because Lippa retained her totaled vehicle.  Progressive's suggestion that "the value of the salvage may make up for any purported underpayment in the valuation" is nonsensical, because Progressive reduces the amount it pays insureds like Lippa by the salvage value.  Progressive suggests it might have miscalculated salvage value and thus overpaid, but that argument is speculative and unsupported by evidence.  The potential for slight factual differences does not defeat typicality.  *See In re Drexel Burnham Lambert Grp., Inc.*, 960 F.2d 285, 291 (2d Cir. 1992) (holding that typicality "is satisfied when each class member's claim arises from same course of events, and each class member makes similar legal arguments to prove the defendant's liability"); *Dixon v. Bemis Co.*, No. 19 Civ. 3356, 2020 WL 7212082, at *3 (S.D.N.Y. Mar. 10, 2020) ("[T]he lead plaintiff's claims need not be identical to the claims of the class . . . ." (cleaned up)).

Second, Progressive argues that Lukasik is atypical because he negotiated a higher payout than Progressive originally offered.  The evidence Progressive cites does not support this

assertion.  If in fact Lukasik's payout was not "based on" a Mitchell Report, then Lukasik would

not be a member of any class or subclass.  *See Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*,

222 F.3d 52, 59 (2d Cir. 2000).  At this point, he would no longer be a class representative, but

he is not the sole representative of any class or sub-class and thus his individual circumstances

would not defeat certification on typicality grounds.

### 5.  Adequacy of Representation

Contrary to Progressive's argument, "the representative parties will fairly and adequately

protect the interests of the class."  Fed. R. Civ. P. 23(a)(4).  Progressive asserts that the named

Plaintiffs are inadequate class representatives because of their "tactical decision to accept all

aspects of [Progressive's valuation methodology] except the application of the PSA."

Progressive speculates that absent class members "may dispute valuable aspects of their

valuation other than the PSA," and those arguments would be precluded by a judgment in this

case.  That argument does not diminish the named Plaintiffs' ability to represent the class

because, as Progressive points out, the named Plaintiffs themselves dispute other "valuable

aspects of their valuation."  The named Plaintiffs thus share the interest of any potential absent

class members who might similarly have multiple complaints about Progressive, and have no

"interests antagonistic to the interests of other class members."  *In re Literary Works in Elec.*

*Databases Copyright Litig.*, 654 F.3d 242, 249 (2d Cir. 2011) ("The adequacy inquiry under

Rule 23(a)(4) serves to uncover conflicts of interest between named parties and the class they

seek to represent.  To satisfy Rule 23(a)(4), the named plaintiffs must possess the same interests

and suffer the same injuries as the class members." (cleaned up) (quoting *Amchem Prods., Inc. v.*

*Windsor*, 521 U.S. 591, 594-95 (1997))); *accord Iowa Pub. Emps.' Ret. Sys. v. Bank of Am.*

*Corp.*, No. 17 Civ. 6221, 2022 WL 2829880, at *19 (S.D.N.Y. June 30, 2022).  Plaintiffs have an

"interest in vigorously pursuing the claims of the class," and will be adequate representatives in doing so. *In re Literary Works*, 654 F.3d at 249; *accord Iowa Pub. Emps.'*, 2022 WL 2829880, at *19.

### 6.  Predominance

Plaintiffs frame the key question presented by their breach of contract claims for the Breach of Contract Class as whether the application of PSA deductions resulted in paying class members less than "actual cash value" for their total loss claims.  For their GBL § 349 claims and the GBL § 349 Class, Plaintiffs frame the question as whether Progressive misled class members by representing that the PSA reflects actual consumer purchasing behavior of negotiating list prices down prior to sale.  Plaintiffs assert that, other than the PSA, Progressive accurately accounts for "market value, age, and condition" of cars, as required by the Policies. For Plaintiffs, the key question for both claims and for all classes and subclasses is, in substance, whether the PSA reflects how cars are valued and sold in the market.  Plaintiffs argue that this question is susceptible of a common answer for all class members.  *See Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011) ("What matters to class certification is not the raising of common 'questions' -- even in droves -- but rather, the capacity of a class-wide proceeding to generate common *answers* apt to drive the resolution of the litigation."); *accord Haymount Urgent Care PC v. GoFund Advance, LLC*, No. 22 Civ. 1245, 2023 WL 185499, at *2 (S.D.N.Y. Jan. 13, 2023).  Plaintiffs seek to prove that the PSA is categorically illegitimate because any negotiation behavior in the market is negligible.  Plaintiffs claim they can establish this proposition with common proof, including expert testimony on the state of the market and data showing the relationship between list and sales prices for vehicles.

Progressive argues that this purportedly common question is rife with individual inquiries that predominate over any common questions.  First, Progressive argues that there is no common evidence that each individual PSA turned out to be inaccurate.  Second, Progressive argues that, even if any PSAs were inaccurate, Plaintiffs cannot establish with common evidence the value of each putative class member's vehicle, in order to prove that the value was higher than the amount Progressive estimated.  Third, Progressive argues that whether class members suffered injury is not susceptible to classwide proof because, even if Progressive's valuation process produced an inaccurate estimate, individual class members might not have been harmed, for example because no PSA was applied in valuing their vehicles or because they negotiated their settlement or had "gap insurance" coverage.  Fourth, and relatedly, Progressive argues that Plaintiffs have not offered a viable, common damages methodology.  Each of these arguments is unavailing.  To the extent Progressive has identified individual issues that may need to be worked out at the margins, the critical common questions identified by Plaintiffs predominate over those individual inquiries.

### a.  Common Proof that the PSA Is Inaccurate

Progressive first argues that Plaintiffs lack common proof that the PSA was inaccurate, because the accuracy of a "specific" PSA depends on the actual, ultimate selling prices of each of the cars to which it was applied.  Progressive argues that some of the vehicles to which a PSA was applied might have sold for the amount Progressive calculated or even less.  Thus, viewed in hindsight, some class members might have received the same amount or more than they would have had Progressive used the ultimate selling price of those same vehicles.  Progressive asserts that those class members received "actual cash value" as required by their policies, or perhaps a

windfall, so they cannot establish that their contracts were breached or that they were deceived about the PSA.

These arguments misconstrue what the PSA is and why Plaintiffs say it is deceptive and breaches the Policies. The PSA is calculated at a specific point in time, to value a vehicle at that moment. The PSA purports to project the outcome of uncertain future sales using aggregate data from past sales of similar vehicles. Progressive claims to have a statistically sound basis for predicting that sales of the specific comparable vehicles at issue will follow the pattern drawn from that data. Plaintiffs' complaint is not that the specific PSA applied to any specific comparable vehicle guessed wrong in hindsight, but that no PSA should have been applied in the first instance, because the data itself is manipulated. Whether applying the PSA was a legitimate methodology, and whether Progressive misled insureds about it, does not depend on whether the PSA's predictions occasionally came true.

### b. Common Proof of Actual Cash Value

Progressive also argues that Plaintiffs cannot establish with common evidence the value of each class member's vehicle, in order to prove that the value was higher than the amount Progressive estimated. Plaintiffs respond that they intend to argue that each vehicle should be valued by running every step of Progressive's methodology except for the PSA. Contrary to Progressive's argument, Progressive's own valuation data, with and without the PSA, constitutes class-wide proof of actual cash value, which can be compared with the amount Plaintiffs were paid to determine liability and damages.

Progressive cannot dispute that applying every aspect of its valuation process other than the PSA leads to an accurate valuation, at least in situations where application of a PSA is inappropriate. For example, Progressive does not apply a PSA where comparable vehicles have

already been sold, or where unsold comparable vehicles are listed by "no-haggle" or "one price" dealerships. Plaintiffs claim, in effect, that all or virtually all dealerships today are "no-haggle," "one price" dealerships. *Cf. Ngethpharat v. State Farm Mut. Auto. Ins. Co.*, No. 20 Civ. 454, 2022 WL 1404526, at *3 (W.D. Wash. May 4, 2022) (rejecting an analogous argument where the defendant had "never represented that the correct ACV is [its vendor's] valuation minus the deductions"). If the factfinder accepts Plaintiffs' evidence on the state of the market, then simply recalculating the valuation using Progressive's methodology without the PSA will accurately value each class member's vehicle.

Progressive instead argues that Plaintiffs must do their own individual valuations of each class member's vehicle, independent of Progressive's. The cases on which Progressive relies are distinguishable. In several such cases, the plaintiffs offered *no* proof of "actual cash value," and did not even argue that they had been underpaid. Rather, those plaintiffs argued that certain adjustments violated technical state insurance regulations that did not affect the valuation. *Lara v. First Nat'l Ins. Co. of Am.*, 25 F.4th 1134, 1137, 1139 (9th Cir. 2022); *see Ngethpharat*, 2022 WL 1404526, at *3 (decertifying class in light of *Lara* where "Plaintiffs admit . . . they have never intended to show that they received less than the ACV"). In several other cases, the plaintiffs argued that Progressive's valuations were wrong because they did not match valuations from the National Automobile Dealership Association ("NADA"), but did not show that NADA valuations constituted "actual cash value" as required by the contracts. *See Richardson v. Progressive Am. Ins. Co.*, No. 18 Civ 715, 2022 WL 154426, at *22-23 & n.15 (M.D. Fla. Jan. 18, 2022); *Curtis v. Progressive N. Ins. Co.*, No. 17 Civ. 1076, 2020 WL 2461482, at *1 (W.D. Okla. May 12, 2020). And in yet another case, the court rejected as a matter of law the plaintiffs' argument that a particular adjustment was categorically improper and could simply be

17

zeroed out of the valuation.  *See In re State Farm Fire & Cas. Co.*, 872 F.3d 567, 576-77 (8th Cir. 2017) ("[D]etermining actual cash value by depreciating replacement cost -- the method employed by State Farm in this case . . . -- is an eminently practical and reasonable method for making an initial *estimate* of actual cash value at the time of loss.").

The rest of Progressive's arguments are also unpersuasive.  Progressive argues that valuing a car is an individualized, vehicle-specific task, involving numerous factors.  Progressive also argues, and Plaintiffs agree, that there are many acceptable valuation methodologies, none of which necessarily is compelled by the Progressive Policies.  But that would equally be true if any individual class member tried to use this or any other method of proof in an individual contract action.  Progressive is free to dispute Plaintiffs' proof of "actual cash value" when it is asserted on behalf of tens of thousands of insureds just as when it is asserted for only one.  But Progressive can hardly complain that the methodology Plaintiffs would impose on them is the one Progressive chose and developed.  The fact that the jury might not be persuaded by Plaintiffs' common proof does not mean Plaintiffs lack common proof.

Progressive's remaining arguments are, in effect, that Plaintiffs and the jury must do their own valuation from the ground up because it is possible Progressive got it wrong somewhere along the way.  Progressive speculates that, even if it undervalued one car because of the PSA, it might have overvalued others.  Progressive might have left an important variable out of its formula, or might have made a mistake or an incorrect assumption in the absence of data.  All of these arguments are speculative and would not defeat predominance even if they were relevant.  *See, e.g.*, *Pub. Emps.' Ret. Sys. of Miss. v. Merrill Lynch & Co., Inc.*, 277 F.R.D. 97, 119 (S.D.N.Y. 2011) ("Sheer conjecture that class members 'must have' discovered that the 'reps and warranties' at issue in this case were in fact false is insufficient to defeat Plaintiff's showing of

18

predominance when there is no admissible evidence to support Defendants' assertions."). Here, none of the issues Progressive raises would undermine Plaintiffs' common proof of "actual cash value," even if they were based on more than speculation. As discussed above, the parties do not dispute that, at least in the cases where a PSA is not applied, Progressive's methodology accurately values insureds' vehicles.

### c. Common Proof of Injury

Progressive argues that certain class members might have unique individual circumstances that differentiate them from the rest of the class. In particular, Progressive argues that some of the class members might have incurred less harm, or no harm at all, either because (1) no PSA was applied to any comparable vehicle in valuing their vehicles, (2) they negotiated different settlements than initially calculated by Progressive or (3) they had gap insurance coverage that paid the difference between the amount Progressive paid and the outstanding loan on the vehicle. These arguments sound in predominance and Article III standing, since Progressive argues that at least some class members suffered no harm whatsoever. These arguments are unpersuasive.

These issues are largely irrelevant because of the class and subclass definitions that exclude certain insureds and others. The classes include only individuals for whom "actual cash value was decreased based upon [PSAs]." The classes exclude individuals whose settlement amounts were not based on a Mitchell Report, which the parties agree excludes insureds who negotiated different settlements than Progressive estimated. *Cf. Lara*, 25 F.4th at 1140 (affirming denial of class certification where there apparently were no such carve-outs and the defendant "could have adjusted the value back up, [or] made a higher offer, or the parties could have done appraisals"). And the classes are defined to include only insureds who "received

compensation for the total loss of a covered vehicle."  According to Progressive, when an insured had outstanding debt on their vehicles and gap insurance, the entire settlement paid by Progressive went to the "lienholder," not an insured class member.  Those insureds are not class members and do not create an Article III standing problem for the class.  *See Denney v. Deutsche Bank AG*, 443 F.3d 253, 264 (2d Cir. 2006) ("The class must . . . be defined in such a way that anyone within it would have standing.").

The fact that limited individual inquiry may be required to determine class membership is relevant to the predominance inquiry but not dispositive.  Unlike the cases on which Progressive relies, the need "to look at every class member's transaction documents to determine who did and who did not have a valid claim" does not create a substantial individual issue that defeats the predominance of common issues.  *In re Petrobras*, 862 F.3d at 274 (quoting *Mazzei v. Money Store*, 829 F.3d 260, 272 (2d Cir. 2016)) (cleaned up).  Progressive's records contain records of how much was paid, to whom, as well as the Mitchell Reports showing the valuation estimates. There is no need here to apply a complex legal analysis to each set of documents, as would be required to determine whether loan documents place two parties in privity, *Mazzei*, 829 F.3d at 272, or whether a transaction is "domestic," *In re Petrobras*, 862 F.3d at 274.[1]

### d.  Common Damages Methodology

For the reasons discussed above, Plaintiffs have proffered common proof that the PSA is invalid and should be removed from Progressive's valuations, and common proof of "actual cash

---

[1] Progressive claims that negotiated payments to augment settlements would not be reflected in one particular data field and may require more time-consuming review of claim files.  Assuming that is true, it still does not raise the specter of mini-trials that might defeat predominance. Progressive's own recordkeeping choices might increase their own burden in discovery, but that is no reason to deny class certification.  *See Mullins v. Direct Digit., LLC*, 795 F.3d 654, 669 (7th Cir. 2015) (rejecting argument that defendant must have "a *cost-effective* procedure for challenging every individual claim to class membership").

value" once the PSA is removed, in the form of Progressive's own calculations.  Because

Plaintiffs take the position that the PSA should not exist at all, a damages model based on simply

removing the PSA and re-running the valuations matches Plaintiffs' liability theory.  *See*

*Comcast Corp. v. Behrend*, 569 U.S. 27, 35 (2013) ("[A] model purporting to serve as evidence

of damages in this class action must measure only those damages attributable to [plaintiffs'

liability] theory."); *Slade v. Progressive Sec. Ins. Co.*, 856 F.3d 408, 411 (5th Cir. 2017) (holding

that, after replacing allegedly unlawful "base value" using common methodology, a damages

methodology of "essentially rerunning Defendant's calculation of actual cash value but with a

lawful base value" "fits with Plaintiffs' liability scheme because it isolates the effect of the

allegedly unlawful base value" and "there is no principled reason why Defendant's own

condition adjustment scores could not be used to adjust [corrected] base values").  The out-of-

circuit district court case on which Progressive relies is distinguishable because there, the

plaintiffs did not argue that the challenged deduction should not exist at all, only that it was

"statistically invalid."  *Richardson*, 2022 WL 154426, at *22 ("[S]tatistically invalid condition

adjustments do not indicate that class members would be entitled to a refund of the full negative

condition adjustment."); *cf., e.g.*, *Lewis v. Gov't Emps. Ins. Co.*, No. 18 Civ. 5111, 2022 WL

819611, at *9 (D.N.J. Mar. 18, 2022) (certifying a class challenging an alleged sham deduction

"under the guise of a 'condition adjustment,'" using a damages model that simply zeroed out the

deduction).

　　　　Progressive argues that, even if simply removing the PSA from the "actual cash value"

calculation were a theoretically permissible damages model, it could not practicably be applied

class-wide, because the calculations are not sufficiently "formulaic."  That argument is

unconvincing given that Progressive describes at length the formula that it applies.  Progressive

argues it is not as simple as subtracting the dollar amount of the PSA from the final value,

purportedly because some adjustments are applied on a percentage basis after the PSA is applied.

If that were true, removing the PSA would make any percentage adjustments larger or smaller on

an absolute basis.  But Progressive's claim is not supported by its evidence.  While Progressive

portrays "condition adjustments" as a special, unique part of the methodology, Progressive cites

documents that treat condition adjustments like any other adjustment.  Even if Plaintiffs'

methodology does not capture every nuance of Progressive's formula, that would not invalidate

the model for purposes of class certification.  *See Waggoner v. Barclays PLC*, 875 F.3d 79, 106

(2d Cir. 2017) ("To the contrary, *Comcast* explicitly states that calculations need not be exact."

(quoting 569 U.S. at 35) (cleaned up)).

### 7.  Superiority

Progressive does not expressly dispute that "a class action is superior to other available

methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).  To the

extent Progressive's predominance arguments overlap with the superiority requirements, those

arguments are unavailing for the reasons above.  *See Clark v. City of New York*, No. 18 Civ.

2334, 2021 WL 603046, at *6 (S.D.N.Y. Feb. 16, 2021) ("[A] class action is superior where

potential class members are aggrieved by the same policies and the damages suffered are small

relative to the expense and burden of individual litigation." (cleaned up)).

Progressive's arguments about adequacy of representation also sound in superiority in

part.  As discussed above, Progressive argues that class members might wish to challenge other

defects in the valuation methodology or settlement process, and that those claims will be barred

by any judgment in this case.  This argument is unpersuasive because "the marginal value of any

waived claims appears to be relatively low," while "the strategic value of pursuing claims on

behalf of a . . . class is substantial." *In re AXA Equitable Life Ins. Co. COI Litig.*, No. 16 Civ. 740, 2020 WL 4694172, at *7 (S.D.N.Y. Aug. 13, 2020).  Progressive gives examples of class members who were able to secure a few hundred extra dollars from Progressive, but no reason to think anyone would hire a lawyer to sue Progressive for those sums.

### 8.  Subclasses

Plaintiffs' motion to certify subclasses is granted for substantially the same reasons the Breach of Contract and GBL § 349 Classes are certified.  Plaintiffs move to certify four subclasses of each class using the same definitions as the classes, except that each subclass is defined by a single Progressive Company Code, i.e., a single Defendant.[2]  For the reasons discussed above, the requirements of Rule 23(b)(1) and Rule 23(b)(3) are satisfied for the subclasses as well.  Defendants raise no arguments unique to the subclasses.[3]

## IV.   PLAINTIFFS' MOTION TO APPOINT CLASS COUNSEL

Plaintiffs' motion to appoint class counsel is granted with respect to Carney Bates & Pulliam, PLLC ("CBP") and denied without prejudice with respect to the other firms that seek appointment.  CBP itself, and the firms representing Plaintiffs collectively, have been appointed class counsel many times and have extensive experience representing consumers in class actions, including several with similar claims.  *See* Fed. R. Civ. P. 23(g)(1)(A)(ii)-(iii).  Plaintiffs' counsel have done extensive work "in identifying or investigating potential claims in the action"

---

[2] While Exhibit 1 to the Bates Declaration lists only three subclasses of each class, both the Consolidated Amended Complaint and Plaintiffs' motion seek certification of four subclasses.

[3] Plaintiffs Lukasik and Lippa's policies were underwritten by Progressive Casualty.  Plaintiffs Plotts and Goodier's policies were underwritten by Progressive Advanced allegedly in coordination with Progressive Casualty.  Plaintiff Costa's policy was underwritten by Progressive Specialty allegedly in coordination with Progressive Casualty, as was the policy held by the other driver involved in a wreck with Plaintiff.  Plaintiff Verardo's policy was underwritten by Progressive Max allegedly in coordination with Progressive Casualty.

and have vigorously prosecuted those claims to date.  There is no reason to doubt that they will continue to devote the resources to do so.  *See* Fed. R. Civ. P. 23(g)(1)(A)(i), (iv).  Progressive does not dispute the adequacy of Plaintiffs' chosen counsel to represent the class.

That said, Plaintiffs' submissions in support of their motion provide little detail on the relevant experience of several lawyers and law firms involved, and no breakdown of each firms' involvement in the case -- to date and expected in the future.  Nor do Plaintiffs' submissions specify which attorneys and law firms, other than those whose websites are listed, seek appointment as class counsel.  CBP is appointed class counsel since that firm appears to have been acting as lead counsel to this point, Plaintiffs' submission contains the most detailed support for their application and the information submitted indicates that they have substantial experience, expertise and resources.  To the extent Plaintiffs seek appointment of any other attorneys or firms as co-class counsel, that application is denied without prejudice to renewal.

## V.    CONCLUSION

For the foregoing reasons, Progressive's *Daubert* motions are DENIED.  Plaintiffs' motion to certify the Breach of Contract Class and the GBL § 349 Class and their respective sub-classes pursuant to Rule 23(b)(3) is GRANTED, and First-Party Plaintiffs and Plaintiffs respectively are appointed class representatives as follows:

(1) The First-Party Plaintiffs are appointed class representatives to sue Progressive Casualty Insurance Company on behalf of the Breach of Contract Class of all persons who made a first-party claim (which was assigned a Progressive Company Code corresponding to one of the Defendants) on a policy of insurance issued by any Progressive Group entity to a New York resident who, from July 28, 2015 through the date an order granting class certification is entered, received compensation for the total loss of a covered vehicle, where that compensation was based on an Instant Report prepared by Mitchell and the actual cash value was decreased based upon Projected Sold Adjustments to the comparable vehicles used to determine actual cash value.

(a) Plaintiffs Lukasik and Lippa are appointed class representatives to sue Progressive Casualty on behalf of the subclass of the above class including

only individuals whose claims were assigned the Progressive Company Code corresponding to Progressive Casualty.

(b) Plaintiffs Plotts and Goodier are appointed class representatives to sue Progressive Casualty and Progressive Advanced on behalf of the subclass of the above class including only individuals whose claims were assigned the Progressive Company Code corresponding to Progressive Advanced.

(c) Plaintiff Costa is appointed class representative to sue Progressive Casualty and Progressive Specialty on behalf of the subclass of the above class including only individuals whose claims were assigned the Progressive Company Code corresponding to Progressive Specialty.

(d) Plaintiff Verardo is appointed class representative to sue Progressive Casualty and Progressive Max on behalf of the subclass of the above class including only individuals whose claims were assigned the Progressive Company Code corresponding to Progressive Max.

(2) Plaintiffs are appointed class representatives to sue Progressive Casualty Insurance Company on behalf of the GBL § 349 Class of all persons who made a claim (which was assigned a Progressive Company Code corresponding to one of the Defendants) on a policy of insurance issued by any Progressive Group entity to a New York resident who, from July 28, 2018 through the date an order granting class certification is entered, received compensation for the total loss of a covered vehicle, where that compensation was based on an Instant Report prepared by Mitchell and the actual cash value was decreased based upon Projected Sold Adjustments to the comparable vehicles used to determine actual cash value.

(a) Plaintiffs Lukasik and Lippa are appointed class representatives to sue Progressive Casualty on behalf of the subclass of the above-class including only individuals whose claims were assigned the Progressive Company Code corresponding to Progressive Casualty.

(b) Plaintiffs Plotts and Goodier are appointed class representatives to sue Progressive Casualty and Progressive Advanced on behalf of the subclass of the above class including only individuals whose claims were assigned the Progressive Company Code corresponding to Progressive Advanced.

(c) Plaintiffs Costa and England are appointed class representatives to sue Progressive Casualty and Progressive Specialty on behalf of the subclass of the above class including only individuals whose claims were assigned the Progressive Company Code corresponding to Progressive Specialty.

(d) Plaintiff Verardo is appointed class representative to sue Progressive Casualty and Progressive Max on behalf of the subclass of the above class including only individuals whose claims were assigned the Progressive Company Code corresponding to Progressive Max.

(3) The parties shall confer as to the form and manner of Notice, and Plaintiffs shall submit a proposed form of Class Notification to the Court for review and approval within twenty-one days of this Order.

Plaintiffs' motion for appointment of class counsel pursuant to Rule 23(g) is GRANTED in part and DENIED in part.  Carney Bates & Pulliam, PLLC is appointed class counsel for all classes and subclasses.  Plaintiffs' motion is denied without prejudice with respect to the other firms representing Plaintiffs.

The Clerk of Court is respectfully directed to close the motions at Docket Numbers 172 and 199.

Dated: March 16, 2023
New York, New York

LORNA G. SCHOFIELD
UNITED STATES DISTRICT JUDGE

26